70 F.3d 469
 69 Fair Empl.Prac.Cas. (BNA) 644,
67 Empl. Prac. Dec. P 43,790, 104 Ed. Law Rep. 1046
 Laurel A. JOHNSON, Plaintiff-Appellant,
v.
UNIVERSITY OF WISCONSIN-EAU CLAIRE, Thomas F. Miller, Donald
F. Reynolds, Marjorie R. Smelstor, Bernard
Duyfhuizen, Douglas A. Pearson, and
Allen L. Curtis, Defendants-Appellees.
 No. 95-1361.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 18, 1995.
Decided Nov. 15, 1995.
 
 Douglas O. Johnson (argued), Eau Claire, WI, for Plaintiff-Appellant.
 David C. Rice, Asst. Atty. Gen., Jennifer Sloan Lattis, Asst. Atty. Gen. (argued), Monica Burkert-Brist, Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Defendants-Appellees.
 Before FLAUM, KANNE, and ROVNER, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 Laurel Johnson sued the University of Wisconsin-Eau Claire pursuant to both 42 U.S.C. Sec. 1983 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Secs. 2000e-2(a) and 2000e-3(a). Johnson claimed 1) that she was subject to wage discrimination for academic years 1990-91 and 1991-92 because of her sex and 2) that she was retaliated against for protesting the wage discrimination in June of 1991, for complaining about her 1991-92 appointment letter, and for filing a complaint in January 1992 with the Equal Employment Opportunity Commission. Johnson alleged that the University, through the named defendants, retaliated against her by limiting the number of classes she was assigned, reducing her wages, giving her a low performance rating, and ultimately terminating her employment. The district court granted summary judgment for the defendants, and Johnson appealed. We affirm.
 
 I.
 
 2
 From 1984 until 1993 Laurel Johnson worked for the University of Wisconsin-Eau Claire ("UWEC") teaching composition courses in the Department of English. Throughout this period, Johnson was employed under successive, one-year, fixed-term, "Option 2" contracts.[1] Unlike faculty members, who generally hold PhD degrees and either have tenure or are being considered for tenure, academic staff like Johnson rarely have PhD degrees and are given only one-year contracts, with no expectation of renewal. According to the UWEC Faculty and Academic Staff Handbook, such "fixed-term" appointments are "renewable solely at the option of the University, and carry[ ] no expectation of re-employment beyond the stated term, regardless of how many times renewed." Furthermore, all of Johnson's contracts contained the following language: "Please note that it is not intended at present to renew this fixed term appointment." The contracts also expressly noted that tenure was not possible under her contract.
 
 
 3
 Roger Anderson was also hired in 1984 by the English Department under an Option 2 contract. Anderson and Johnson both had masters degrees. Johnson's initial salary "base rate" was $800 higher than Anderson's, apparently because Johnson had two years prior experience teaching high school. At the time, base rates for academic staff were established through a recommendation by the relevant department, which would have to be approved by the Dean of the School of Arts and Sciences and the Chancellor's office. Actual compensation each year was determined by multiplying the base rate by the percentage of a full teaching load that was taught. A full teaching load was 12 credits per semester, 24 credits per year.
 
 A. 1990-91 Academic Year
 
 4
 In succeeding years, Johnson and Anderson were rehired annually under similar one-year, fixed-term contracts. While their appointment percentages varied, they received incremental raises annually, and Johnson's base rate remained approximately $800 higher than Anderson's until the 1990-91 academic year. Johnson's base rate for 1990-91 was raised incrementally to $19,450, and she was given a 100% teaching appointment for both semesters. Anderson's base rate for the year was raised incrementally to $19,000, but he was allotted only a 83.33% (10 credits) fall teaching load and a 41.67% (5 credits) spring teaching load. As a result, Anderson would have made $7916.35 for the fall and $3958.65 for the spring, for a total of $11,875 for the year. Teaching 15 credits for this salary amounts to a rate of $791.67 per credit. (Since Johnson taught a full load, she was effectively paid $810.42 per credit.)
 
 
 5
 Since occasional or one-time temporary teachers were paid $800 per credit, Anderson complained to Lee Grugel, Dean of the School of Arts and Sciences. Dean Grugel then wrote a letter to the Acting Vice Chancellor, Patricia Ostmoe, recommending that for the 1990-91 school year Anderson be paid at the $800 per credit rate, stating that this rate should be "the absolute minimum for a person of Mr. Anderson's experience and qualifications." The per credit approach was approved, and Anderson was paid $8000 for the fall term (10 credits) and $4000 for the spring term (5 credits).[2] This would have increased his academic year salary by only $125, from $11,875 to $12,000. Because Anderson's spring appointment was later increased to 8 credits, he ended up being paid $14,400 for the year (18 credits at the $800 per credit rate).[3] It should be noted that even teaching a full load at the $800 per credit rate amounts to a yearly salary of $19,200, i.e., $250 less than Johnson's base rate and actual salary for the 1990-91 academic year.
 
 B. 1991-92 Academic Year
 
 6
 On May 13, 1991, Nadine St. Louis, Chair of the English Department, recommended an "equity" raise in the base rates of both Johnson and Anderson to $21,000 for the 1991-92 academic year.[4] The procedure for establishing salary levels at the time was that the chair of the department would make a recommendation, which could be accepted, rejected, or altered by the dean of the college. The college dean would then send a final salary recommendation to the vice chancellor, who would review the request and prepare an appointment letter for the chancellor's signature. St. Louis's recommendations for both Johnson and Anderson were approved and signed by Dean Grugel on May 20, 1991 and by Vice Chancellor Marjorie Smelstor on May 23, 1991.
 
 
 7
 These salary recommendations eliminated the previous base-rate differential between Anderson and Johnson. St. Louis notes in her affidavit that Johnson's high school teaching experience did not affect her recommendation, since her primary aim was to improve the very low salary of both within the budget limitations of the department and to establish base rates exceeding the $800 per credit that temporary teachers received. Dean Grugel likewise states in his affidavit that it would not have been uncommon at UWEC for minor pay distinctions, like one premised on such a small differential in experience, to be eliminated during subsequent pay increases.
 
 
 8
 When the actual contract letters were sent on June 10, 1991, however, Anderson's base rate was $21,000, while Johnson's was only $19,450. Upon learning of the situation shortly thereafter, the new Acting Chair of the Department of English, Bernard Duyfhuizen, phoned Dean Grugel about the discrepancy. When Duyfhuizen requested that Johnson's base rate be changed, however, he mistakenly used the term "equity" to describe the problem. Consequently, Dean Grugel apparently understood Duyfhuizen to be requesting an additional equity increase for Johnson (rather than the correction of an error) and told Duyfhuizen that any such adjustment would have to wait until all salary decisions had been made, when the remaining budget could be determined.
 
 
 9
 Duyfhuizen reported this conversation to Nadine St. Louis. And on June 13, 1991, St. Louis wrote a letter to Dean Grugel about the disparity and requested that Johnson's contract be rewritten with a $21,000 base rate. St. Louis stated that "I don't believe any sex discrimination was intended here, knowing you as I do," but pointed out that Ms. Johnson understands "forms of discrimination" and is married to a lawyer. St. Louis also noted that the situation looked like "the nicest grounds for a sex-discrimination suit that have come across my desk in a long time." On June 25, 1991, Johnson personally wrote Dean Grugel, accusing the University of sex discrimination and requesting either an explanation in writing why the department's salary recommendation was not followed or an amended contract.
 
 
 10
 After receiving all of these contacts, Dean Grugel wrote the Vice Chancellor for Academic Affairs, Marjorie Smelstor, on July 1, 1991 and "strongly recommend[ed]" that Johnson's base rate be made equal to that of Anderson for the up-coming school year. The letter was forwarded to Thomas Miller, the Associate Vice Chancellor, whose office had prepared the earlier contract letters. Miller, who had just assumed the post, could not find any documentation that anyone had actually rejected the English Department's recommendation for Johnson (approved by the dean and the vice chancellor), so he assumed that offering Johnson the same base rate as the previous year had simply been a clerical error. On July 17, 1991, Miller sent a letter of apology to Johnson, stating that the whole thing was a "purely unintentional clerical mistake," and a new contract with a base rate of $21,120. Thus Johnson's base rate was changed before any work was performed under the new contract, and all of her checks for the 1991-92 academic year were based on the $21,120 base rate.
 
 C. 1992-93 Academic Year
 
 11
 English 110-Freshman Composition is a required course for all undergraduates at UWEC. (Honors students take a parallel course within the Honors Program.) In order to promote equality within the English Department, all academic faculty within the department teach one section of English 110 each semester that they are in residence. Nevertheless, in the years preceding the 1992-93 academic year, a backlog developed of undergraduates needing this staple course, which upset parents, students, and school administrators. Articles appeared in the student newspaper in the spring of 1992 describing the problem and the solution eventually proposed by Vice Chancellor Smelstor. Smelstor appropriated $40,000 to the English Department for the 1992-93 academic year for the purpose of eliminating the backlog and providing the course to all incoming freshman. While she did not mandate specifically how the money was to be used to eliminate the backlog, she made clear that no additional money was available.
 
 
 12
 The $40,000 was not enough to staff all the necessary English 110 sections and to hire back the entire academic staff full time and at their previous salary. Consequently, the English Department eventually decided to re-employ the members of the academic staff from the previous year, but at only 93.447% of their 1991-92 base rate. In addition, class sizes were increased for all English faculty and academic staff, and most of the academic staff were given significantly reduced teaching appointments. Among the eight academic staff for the 1992-93 academic year, only Bergine Haakenson was recommended for a 100% appointment. All of the others were recommended for 50% or smaller appointments. Johnson was given a 50% appointment. Anderson's fall semester appointment was increased to 75% during the summer of 1992, when an additional fall section of remedial English was added at a time that he was available to teach.
 
 
 13
 Karen Welch returned to the regular English Department academic staff for the 1992-93 academic year. Welch was an Option 3 employee who had been teaching English courses at UWEC since 1987. In the fall of 1989, she took over teaching English composition courses in the Honors Program, while the regular instructor pursued her PhD. Throughout her time at UWEC, Welch had been supervised by the English Department Chair and remained administratively attached to the English Department. Because the previous Honors Program composition teacher was scheduled to return from leave, Welch asked to return to teaching in the English Department for the 1992-93 school year. Welch had begun a PhD program in composition theory in December of 1991 at the University of Minnesota.
 
 D. 1993-94 Academic Year
 
 14
 Donald Reynolds became Dean of the School of Arts and Sciences at UWEC during the summer of 1992. One of his goals was to decrease reliance on academic staff for teaching courses for which there would be a predictable, ongoing need. Vice Chancellor Smelstor shared his goal of increasing teaching by tenure track faculty, who would have PhD's and be more qualified than typical members of the academic staff. In August 1992, Dean Reynolds informed Bernard Duyfhuizen, Chair of the English Department, that he intended to authorize the English Department to recruit five or six tenure track faculty positions over the next two to three years and that this would have the effect of decreasing the need for academic staff. Duyfhuizen then told the English Department academic staff, including Johnson, that because all of them would not be renewed for the 1993-94 academic year, they should get their personnel files prepared for a fall performance review. Up until the preceding year, 1991, performance reviews had been conducted annually in the fall. In 1991 the English Department's executive subcommittee announced that academic staff would no longer be reviewed annually. However, by the fall of 1992, the composition of the subcommittee had changed, with former department chair Douglas Pearson becoming subcommittee chair. (The executive subcommittee does not include the department chair.) Pearson's committee reinstated the annual reviews and approved the use of a new "good" classification for performance ratings, which had previously been limited to "excellent," "very good," and "not satisfactory." (The "good" ranking apparently was intended as an alternative to the harsh "not satisfactory" ranking, but was not intended to be entirely positive.)
 
 
 15
 Allen Curtis, a teacher in the Department of English and a member of the subcommittee, was assigned to draft Johnson's evaluation for the fall 1992 performance review. Relevant data for these performance reviews included the following: student evaluations from the previous year, classroom visitation reports, course materials, and curriculum vitae information. After reviewing the documents in Johnson's file, Curtis drafted a review for the department personnel subcommittee. Upon reviewing Johnson's file and the Curtis review, the subcommittee gave her a rating of "good." Previously Johnson had always been rated "very good," and she was never told that she needed to improve her teaching.
 
 
 16
 Johnson was upset by the low rating and, upon reviewing the copy of the Curtis review provided to her, realized that a summary of her 1990-91 student evaluations was missing from her file, along with one set of 1991-92 student evaluations. The summary had been prepared by Wilma Clark, a member of the 1991 department subcommittee. Johnson went to Department Chair Pearson about the problem, giving him an annotated copy of the original performance evaluation prepared by Curtis and the raw data from the missing 1991-92 student evaluations. Johnson maintains that Pearson told her that performance and experience "don't matter for rehiring anyway." At any rate, Pearson personally prepared a new draft of Johnson's performance review, taking into account the additional 1991-92 student evaluations. He did not, however, consider Clark's summary of the 1990-91 evaluations, which had been significantly better, though he did include it in Johnson's file. According to Pearson's affidavit, a staff member's performance evaluation is based only upon data from the period under review, and past performance ranking is not a criteria in the evaluation.
 
 
 17
 On November 19, 1992, the executive subcommittee took up Pearson's new draft review of Johnson. The subcommittee did not change its evaluation, however, and again rated Johnson as merely "good," supporting this rating by the fact that Johnson's 1991-92 student evaluations were below the department mean in over half the areas evaluated. The review originally prepared by Curtis (along with Johnson's annotated copy) was ordered destroyed after the new one was prepared. Other academic staff had significantly better evaluation scores and were rated "very good" or "excellent," accordingly. Only Johnson and Anderson received the "good" rating. In December of 1992, the English Department forwarded to Dean Reynolds its preliminary position requests for the 1993-94 academic year, requesting approval to hire back only four academic staff.
 
 
 18
 On January 8, 1993, Johnson filed a claim with the Equal Employment Opportunity Commission ("EEOC") alleging wage discrimination based on sex for the 1992-93 school year and retaliation for complaining about this inequity.[5] That same month the English Department developed a "Proposed Schedule of Classes" for the fall 1993 semester."[6] The proposed schedule lists Johnson's name as teaching two courses. In February of 1993, the English Department received authorization from the Dean to fund only four courses to be taught by academic staff for the 1993-94 school year. This decrease accorded with the new university and department policy to seek and rely on more tenure track faculty in the future. The English Department decided to offer four courses taught by temporary instructors: English 211--Writing About Literature, English 425--Book Editing and Publishing, and two sections of English 099--Remedial English.
 
 
 19
 The department subcommittee ultimately recommended Carol Hale-Wood to teach English 211, Patricia Duyfhuizen to teach English 425, and Karen Welch to teach the two English 99 remedial sections. Hale-Wood, unlike Johnson, had taught the 211 course before, received a "very good" rating, and had nearly completed her PhD. Patricia Duyfhuizen was the only person qualified to teach the 425 book editing course and had received the "excellent" rating. And as between Johnson, Anderson, and Welch, the English Department found Welch to be the best choice for teaching the remedial courses. Welch had received the "very good" rating, had nearly as much teaching experience as Johnson and Anderson, and was enrolled in a PhD program in composition theory at the University of Minnesota. Of the eight academic staff who had taught during the 1992-93 academic year, only the above three women were rehired for 1993-94. Roger Anderson, the only male in the group, was not given a new contract. Although Johnson's name appeared in the January 1993 preliminary course assignment schedule, she was ultimately not given one of the four available teaching slots for 1993-94.
 
 E. Academic Year 1994-95
 
 20
 During the 1993-94 academic year, the English Department requested and received authorization to rehire Duyfhuizen, Hale-Wood, and Welch for the 1994-95 academic year. During the Spring of 1994 it became apparent that the 1994-95 student enrollment would be higher than expected, and Dean Reynolds authorized the English Department to hire additional academic staff to teach four more sections of English 110. Since Johnson's records remained in the department file, she was considered, but was not selected. Instead, the department filled these slots by bringing in two new people: Jack Bushnell, a finalist for a previous permanent faculty search, and Ruth Olson, who expected to receive her PhD in August of 1994.
 
 II.
 
 21
 Johnson argues that summary judgment was inappropriately granted for the defendants because she made out a prima facie case of discrimination and retaliation under Title VII and because she presented a substantive basis for her Sec. 1983 claim. We review a grant of summary judgment de novo, drawing all reasonable inferences in favor of the non-moving party. Smith v. Shawnee Library Sys., 60 F.3d 317, 320 (7th Cir.1995). We will affirm the entry of summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. We note, however, that where the party opposing a motion for summary judgment bears the burden of proof on an issue, she may not rest on the pleadings, but must affirmatively demonstrate a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). And a genuine issue of material fact is more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
 
 A. Title VII
 
 22
 Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. Sec. 2000e-2(a)(1) (1994). Title VII also makes it unlawful for an employer to discriminate or retaliate against any of its employees for opposing an unlawful, discriminatory employment practice. 42 U.S.C. Sec. 2000e-3(a) (1994). A plaintiff in a Title VII case may offer either direct proof of sex-based discrimination or retaliation, or may use the burden-shifting approach established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). King v. Board of Regents, 898 F.2d 533, 537 (7th Cir.1990). Johnson does not purport to offer direct proof of discrimination or retaliation and agrees that the burden-shifting approach employed by the district court was the proper legal analysis for her Title VII claims.
 
 1. Wage Discrimination
 
 23
 Under the McDonnell Douglas burden-shifting approach, the plaintiff in a Title VII discrimination case must carry the initial burden of establishing a prima facie case of discrimination. 411 U.S. at 802, 93 S.Ct. at 1824. In Furnco Construction Corp. v. Waters, 438 U.S. 567, 579-80, 98 S.Ct. 2943, 2950-51, 57 L.Ed.2d 957 (1978), the Supreme Court noted that a prima facie case in this context "is simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." If the plaintiff establishes a prima facie case, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the challenged action. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824; accord St. Mary's Honor Center v. Hicks, --- U.S. ----, ---- - ----, 113 S.Ct. 2742, 2747-48, 125 L.Ed.2d 407 (1993) (defendant must produce evidence which, if believed, would support a finding that unlawful discrimination was not the cause of challenged action). If the employer succeeds in doing so, the burden returns to the plaintiff employee, who can then prevail only if she can show that the reason offered by the employer was not the real reason for the challenged action, but merely a "pretext" for discrimination. McDonnell Douglas, 411 U.S. at 804, 93 S.Ct. at 1825. Throughout a Title VII case, the plaintiff retains the ultimate burden of persuasion to prove, by a preponderance of the evidence, that the employer intentionally discriminated against her. Loyd v. Phillips Bros., Inc., 25 F.3d 518, 522 (7th Cir.1994); St. Mary's, --- U.S. at ---- - ----, 113 S.Ct. at 2747-50.
 
 
 24
 The determination of what constitutes a Title VII prima facie case is a question of law. Loyd, 25 F.3d at 522. In the wage discrimination context, neither the Supreme Court nor this Circuit has established a definitive standard, but we have held that a prima facie case does require a plaintiff such as Johnson to produce evidence that she was paid less than a similarly-situated male or males. Weiss v. Coca-Cola Bottling Co., 990 F.2d 333 (7th Cir.1993).[7]
 
 
 25
 Johnson's claim of wage discrimination for academic years 1990-91 and 1991-92 falters on this fundamental requirement. The "similarly-situated" male to which Johnson compares herself is Roger Anderson. Yet Johnson was paid more than Anderson in academic year 1990-91 and the same as Anderson in academic year 1991-92. The fact that the margin between Johnson and Anderson's pay rates (her base rate had been $800 higher) decreased for the 1990-91 school year and was eliminated for the 1991-92 school year does not constitute impermissible wage discrimination. For the 1990-91 academic year, Johnson's base rate was higher ($19,450 compared to $19,000 for Anderson); she had a greater teaching load (100% compared to 75% for Anderson); she made more money ($19,450 compared to $14,400); and she effectively was paid more per credit hour ($810.42 per credit hour compared to $800.00 per credit hour). By every relevant measure, Johnson was paid more, not less, than Anderson for the 1990-91 academic year.
 
 
 26
 For the 1991-92 academic year, Johnson and Anderson ultimately received the same base rate of pay: $21,120.[8] So again, Johnson fails to show--or even allege--that she was paid less than a similarly-situated male. While getting her base rate changed (from the $19,450 amount indicated in her initial contract letter to the $21,120 rate she ultimately received) may have frustrated Johnson, by the time she began work under the 1991-92 contract, her base rate was at least as great as that of Anderson. Because Johnson was at no time paid a lower rate than Anderson, she simply cannot make out a prima facie case of wage discrimination. Title VII does not entitle Johnson to an $800 higher base rate than Anderson throughout her time with UWEC, simply because she came in with two years of high school teaching experience.[9]
 
 
 27
 Even if eliminating a previous wage differential did somehow constitute a prima facie case of Title VII wage discrimination, UWEC has come forward with a legitimate, nondiscriminatory reason for equalizing Johnson and Anderson's base rates in their 1991-92 contracts. Department Chair St. Louis maintains that she was trying to get the best for both that was possible within budget constraints, and to get both teachers above the rate being paid to temporary teachers. Dean Grugel notes that it was not uncommon at UWEC for minor pay distinctions based on such slight differences in experience to be eliminated over time. Johnson does not provide any evidence that these asserted nondiscriminatory reasons were pretextual.
 
 2. Retaliation
 
 28
 In order to establish a prima facie case of Title VII retaliation, a plaintiff must show that 1) she engaged in statutorily protected expression; 2) she suffered an adverse action by her employer; and 3) there is a causal link between the protected expression and the adverse action. Brenner v. Brown, 36 F.3d 18, 19 (7th Cir.1994); Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 321 (7th Cir.1992). In order to demonstrate the "causal link," the plaintiff must demonstrate that the employer would not have taken the adverse action "but for" the protected expression. Klein v. Trustees of Indiana Univ., 766 F.2d 275, 280 (7th Cir.1985). Under the McDonnell Douglas burden-shifting analysis, after the plaintiff establishes a prima facie case, the burden of production shifts to the defendant employer to come forward with a legitimate, non-retaliatory reason for its actions. Griffin v. Board of Regents of Regency Univ., 795 F.2d 1281, 1294 (7th Cir.1986). If the defendant rebuts the plaintiff's prima facie case in this manner, the plaintiff then has a chance to show that the defendant's proffered reasons are pretextual. Id.
 
 
 29
 Johnson asserts a number of retaliatory actions; we will address them all in turn. First, Johnson asserts that her 1992-93 salary was reduced in retaliation for her June 1991 protest regarding her 1991-92 base rate. The stumbling block for Johnson's prima facie case, however, is her failure to present any evidence of a causal link between her salary protest and the 1992-93 base rate. The fact that Johnson's 1992-93 base rate was cut to 93.447% of her 1991-92 base rate is not evidence of retaliation, since all the English academic staff had their base rates reduced in this manner. Furthermore, the substantial reduction in Johnson's appointment percentage for the 1992-93 academic year (to a 50% appointment) also fails as evidence of retaliation, since all the academic staff, except Bergine Haakenson, were given a 50% or smaller appointment for that year.[10]
 
 
 30
 Even if Johnson could put on a prima facie case, she has not offered any evidence to show that UWEC's proffered reasons for the base rate and appointment percentage cuts were pretextual. UWEC offers evidence that these cuts were general policy decisions based on specific budget limitations and course needs; they were not directed at Johnson (or anyone else) in particular. Johnson has presented no competent evidence to create a genuine issue of fact regarding whether these reasons were pretextual. Johnson's subjective belief that the action was retaliatory and that the claimed reasons were pretext does not alone create a genuine issue of material fact. McMillian v. Svetanoff, 878 F.2d 186, 191 (7th Cir.1989); Pilditch v. Board of Education of the City of Chicago, 3 F.3d 1113, 1119 (7th Cir.1993).
 
 
 31
 Johnson further maintains that UWEC failed to renew her contract for the 1993-94 academic year in retaliation for her June 1991 protest and her January 1993 EEOC complaint. Beginning with her claim based on the June 1991 protest, Johnson again has failed to put on evidence supporting a causal connection between the protest and the non-renewal of her 1993-94 contract. And the substantial time lapse between the events is counter-evidence of any causal connection. Samuelson v. Durkee/French/Airwick, 976 F.2d 1111, 1115 (7th Cir.1992) (noting that substantial time lapse "discounts" a causal connection between two events). The ultimate decision not to renew Johnson's contract for the 1993-94 school year was made in February 1993--20 months after Johnson's protest; and the performance reviews upon which the decision was based occurred in October and November of 1992--at least 16 months after Johnson's protest.
 
 
 32
 Even if Johnson could establish a prima facie case of retaliation, she offers no competent evidence to rebut the legitimate reasons offered by UWEC for non-renewal of her contract (mainly that only four academic staff courses were authorized, and other persons were more qualified to teach the needed courses). The reinstatement of performance reviews in the fall of 1992, after notice in the fall of 1991 that they would no longer be done, is not evidence of pretext, particularly since Johnson's June 1991 protest preceded the curtailment of performance reviews in 1991.[11] Such performance reviews are standard in colleges and universities, and the rationale for them is uncontroversial. They provide a rational and systematic means of monitoring teaching performance. The fact that the English Department's review policy changed in 1991, and then changed back in 1992, is not evidence of pretext, since the composition of the executive subcommittee had changed between fall 1991 and fall 1992. The UWEC put on evidence that during 1992 the English Department was being pressured by the new dean of the School of Arts and Letters--Donald Reynolds, who began his term during the summer of 1992--along with Vice Chancellor Smelstor, to decrease its reliance on academic staff. Johnson has produced no evidence that this policy shift was merely a pretext to eliminate her or that the reinstatement of the performance review system was designed to get rid of her.
 
 
 33
 The fact that Johnson's initial performance review was based on an incomplete file, like the initial 1990-91 appointment letter that offered her a base rate lower than that offered Anderson, was surely frustrating and annoying for Johnson. However, both of these mistakes were eventually "fixed," and they were fixed before any actual harm resulted from them. Furthermore, Johnson provides no evidence that could support an inference that these incidents were actually intercepted efforts to target her. At oral argument Johnson's counsel claimed that this was a case about "bad things happening to a good person." That may be true, but alone it is not enough to support a Title VII retaliation claim.
 
 
 34
 Moving to Johnson's claim that the non-renewal of her contract for the 1993-94 school year was in retaliation for her January 1993 EEOC complaint (or in retaliation for the combination of her June 1991 protest and her EEOC complaint), Johnson comes closer to establishing a prima facie case in this regard. Johnson points out that her name did appear on the January 1993 proposed schedule of 1993-94 courses, that she complained to the EEOC that month, and that when the department's final recommendations for 1993-94 instructors came out later that spring, she was no longer one of them. Although we have found on other occasions that timing alone does not create a genuine issue regarding causation in a retaliation case, Juarez v. Ameritech Mobile Communications, 57 F.2d 317, 321 (7th Cir.1992) (citing Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir.1986)), the timing of the non-renewal decision, in combination with the other facts alleged by Johnson, may be enough to create a genuine issue of material fact regarding the causal link between her EEOC complaint and her non-renewal for 1993-94. See also Holland v. Jefferson Nat'l Life Ins. Co., 883 F.2d 1307, 1315 (7th Cir.1989) ("telling" temporal sequence between protected action and alleged retaliation can demonstrate causal link for Title VII prima facie case); Johnson v. Sullivan, 945 F.2d 976, 980 (7th Cir.1991) (fact that discharge took place one day after filing of lawsuit supports inference of causation).
 
 
 35
 Yet even assuming that Johnson does establish a prima facie case of retaliation for her EEOC protest, she again presents no evidence to get her over the hurdle of rebutting UWEC's asserted legitimate reasons as pretext. UWEC has offered evidence showing 1) that the fall 1992 performance reviews were based on relevant evidence (student evaluations, etc.) and 2) that the 1993-94 teaching assignments were based on the results of these performance reviews, curricular need for particular courses, and individual expertise in the needed courses. Since these are legitimate, non-discriminatory reasons for not renewing Johnson's contract (along with those of the four other academic staff members who weren't retained), the McDonnell Douglas burden shifts back to Johnson to put forward evidence that these reasons are merely pretext for what was actually discrimination. This Johnson does not do. She offers nothing, beyond her own conjecture, to support her allegation that the English Department's failure to renew over half of its academic staff for the 1993-94 school year (5 of 8 teachers) was part of an elaborate scheme to retaliate against her. Johnson's low performance rating ("good") was supported by her low 1991-92 student evaluations, and her non-renewal for 1993-94 was supported by this low rating.[12]
 
 
 36
 Johnson's subjective belief that she was more qualified than other academic staff members (such as Karen Welch) is not evidence that UWEC's evaluation of her was a pretext for retaliation, Gustovich v. AT & T Communications, 972 F.2d 845, 848 (7th Cir.1992), and neither is her disagreement with UWEC's business decision not to rehire her. Dale v. Chicago Tribune Co., 797 F.2d 458, 464-65 (7th Cir.1986). Even a "bad" business decision does not violate Title VII if the basis of the decision is neither discriminatory nor retaliatory. Gustovich, 972 F.2d at 848 (material dispute about employee's ability differs from material dispute about employer's honesty in its asserted reason for a decision, i.e., the pretext issue); cf. Kier v. Commercial Union Ins. Cos., 808 F.2d 1254, 1259 (7th Cir.1987). Taking all of the proffered evidence in the light most favorable to Johnson, as we must on summary judgment, we simply do not find a genuine issue of material fact regarding whether UWEC's asserted reasons for not rehiring Johnson were pretextual.
 
 B. Sec. 1983 Retaliation
 
 37
 Johnson also claims that UWEC retaliated against her, in violation of 42 U.S.C. Sec. 1983, when it reduced her 1992-93 base rate and appointment percentage, gave her only a "good" performance rating in the fall of 1992, and neglected to rehire her for the 1993-94 academic year. Johnson's Sec. 1983 retaliation claims are based on exactly the same facts as her Title VII retaliation claims, and she again asserts that the retaliation was due to her June 1991 protest about her base rate and her January 1983 complaint with the EEOC.
 
 
 38
 Because Sec. 1983 does not create substantive rights, but rather provides a remedy for violations of pre-existing rights, Sec. 1983 claims must specifically allege a violation of the Constitution or "laws" of the United States. Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979). Although Johnson never clearly asserted what constitutional or statutory provision her Sec. 1983 retaliation claim was based upon, the district court interpreted her claim as being brought under the First Amendment. Because Johnson has neither clarified the basis of her Sec. 1983 claim, nor objected to the district court's interpretation, we too shall treat the claim as a First Amendment one. The Supreme Court established in Mt. Healthy City School District Bd. of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), that a plaintiff bringing a Sec. 1983 claim based on the First Amendment must establish 1) that her conduct was constitutionally protected and 2) that her conduct was a "substantial factor" or "motivating factor" in the challenged action by the defendant. We have noted that even if a defendant was "brimming over with unconstitutional wrath" against the plaintiff, a Sec. 1983 plaintiff cannot prevail unless he or she can establish that the challenged action would not have occurred "but for" the constitutionally protected conduct. Button v. Harden, 814 F.2d 382, 383 (7th Cir.1987). If the plaintiff meets this burden, the defendant must prove, by a preponderance of the evidence, that it would have taken the same action even in the absence of the protected conduct. Mt. Healthy, 429 U.S. at 287, 97 S.Ct. at 576.
 
 
 39
 Johnson fails to provide evidence that her 1991 protest and her 1993 EEOC complaint were a substantial factor in the alleged retaliatory actions. Since a retaliation claim, whether under Title VII or Sec. 1983, requires the plaintiff to establish that "but for" some protected action on her part, some other adverse action would not have occurred, the causation analysis for a Sec. 1983 retaliation claim tracks the causation analysis for a Title VII retaliation claim. Compare Klein v. Trustees of Indiana, 766 F.2d 275, 280 (7th Cir.1985) (Title VII) with Button, 814 F.2d at 383 (Sec. 1983). Thus, we adopt the Title VII retaliation analysis outlined above to find that Johnson failed to show that but for her June 1991 protest she 1) would not have had her 1992-93 base rate and teaching appointment reduced, 2) would not have received the "good" rating in her fall 1992 performance review, and 3) would have been given a new contract for the 1993-94 academic year. She simply has not offered evidence from which a judge or jury could infer that her June 1991 protest caused these subsequent occurrences. As for retaliation based on the 1993 EEOC complaint, we find that even if Johnson could establish a prima facie case that the non-renewal of her 1993-94 contract was in retaliation for the EEOC complaint, she still cannot survive summary judgment. UWEC has proffered evidence that the hiring decisions were based on orders from the administration to reduce reliance on academic staff, curricular need for particular courses, and the relative teaching abilities of the eligible academic staff members (as determined by the fall 1992 performance reviews). Johnson has not offered evidence to rebut the UWEC's claim that its decision was based on these legitimate factors, since her unsupported conjecture is not competent evidence in this regard. Thus, there is no genuine issue of material fact regarding whether Johnson's June 1991 complaint and her 1993 EEOC filing were motivating factors in the challenged actions.
 
 
 40
 We further note that Johnson's June 1991 complaint does not even appear to be "constitutionally protected conduct" under Mt. Healthy. To gain such status, a government employee's speech must be such that it may be "fairly characterized as constituting speech on a matter of public concern." Rankin v. McPherson, 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987) (quoting Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983)). Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of the speech. Id. at 384-85, 107 S.Ct. at 2897. In Gray v. Lacke, 885 F.2d 399, 411 (7th Cir.1989), we recognized that, while sexual harassment may inherently be a matter of public concern, the plaintiff's specific complaint to two of her supervisors about sexual harassment was designed to end that harassment, i.e., it "related solely to the resolution of a personal problem." Johnson's June 1991 protest regarding her base rate was of this nature--it related solely to a personal problem. Johnson was simply trying to get the salary increase that the English Department had recommended and that she believed she deserved. Such workplace speech, while personally important, does not address a matter of public concern, and thus does not merit First Amendment protection.
 
 
 41
 For the reasons outlined above, we AFFIRM the district court's grant of summary judgment for the University of Wisconsin-Eau Claire and the individual defendants.
 
 
 
 [1]
 Instructors in Johnson's position (i.e., non-tenure track) hired after 1985 could no longer have an "Option 2" contract, but instead were given an "Option 3" contract. Both Option 2 and Option 3 academic staff were given one-year contracts that prominently stated that these contracts provide no opportunity for tenure, no matter how many times the appointment is renewed. The only difference between the Option 2 contracts and the later Option 3 contracts was that the Option 2 contracts could be renewed more than 6 years in a row without having to be changed, while the Option 3 contracts would have to be changed to "rolling horizon" contracts if employment went beyond 6 years. This distinction is irrelevant to our decision. For the purpose of this opinion, Option 2 and Option 3 employees will be treated as a group and termed "academic staff." Tenured or "tenure track" (i.e., probationary) teachers will be termed "academic faculty" or "faculty."
 
 
 [2]
 Johnson maintains that Anderson was actually given a base rate of $20,000 for the 1990-91 academic year. To support this claim, she points to a series of notes found on Anderson's 1990-91 contract letter, filed by UWEC. At the bottom of the contract is a typed note, which reads as follows:
 11/2/90
 To: Harry
 From: Barb
 Gerri Dudansky stopped over--wondering about Roger L. Anderson pay rate. She thinks the $20,000 is below the rate for Lecturer. (Never mind that she made a mistake & paid him @ a $30,000 rate.) Let me know please.
 A handwritten note at the top of the contract letter, apparently responding to the typed note at the bottom, reads as follows: "The min. for Lecturer is .80 of Assist. Prof. min., so $20,000 is above that. This is not his base. This is $800 per credit. See me? [signed] H" (emphasis in original). While the meaning of the typed note is not entirely clear, the handwritten note makes clear that Anderson's contract was calculated on an $800 per credit basis, rather than according to the traditional base rate approach. The notes provide no support for Johnson's claim that Anderson was given a $20,000 base rate for the 1990-91 school year.
 
 
 [3]
 If Anderson was being paid at a $20,000 base rate, he would have received $15,000 for teaching 18 credits (a 75% teaching load). Johnson does not deny that Anderson received only $14,400 for the 1990-91 school year
 
 
 [4]
 The word "EQUITY" was typed next to the recommended salary base of $21,000 on the salary recommendation forms for both Johnson and Anderson
 
 
 [5]
 On November 22, 1993, the EEOC issued its determination that the evidence proffered by Johnson did not support a finding of wage discrimination, since "all fixed-term academic appointment English Instructors suffered a reduction in wages for the 1992-93 school year, including a similarly situated male employee." The EEOC also found that the evidence did not support Johnson's claim of retaliation
 
 
 [6]
 The record contains a one page schedule headed "Proposed Schedule of Classes: Fall 1993." The schedule is dated January 25, 1993 and is signed by Bernard Duyfhuizen. It is unclear, however, whether the single page in the record represents the complete proposed schedule; the appellees refer to it as a "partial" schedule
 
 
 [7]
 Because Johnson has not made any claim under the Equal Pay Act, 29 U.S.C. Sec. 206(d)(1), we make no comment on its applicability here
 
 
 [8]
 While the base rate recommended by Nadine St. Louis for both Johnson and Anderson was $21,000, it is clear from the record that Johnson's base rate was ultimately set at $21,120. It is not entirely clear, however, whether Anderson's base rate actually ended up being $21,000 (as his offer letter indicates) or $21,120 (like Johnson). The matter is irrelevant, however, since Johnson nowhere alleges that Anderson was paid at a base rate greater than $21,120 for the 1991-92 academic year, i.e., she fails to allege that he was paid a higher rate than she was
 
 
 [9]
 Johnson has claimed, before the district court and in her brief, that even if she was technically paid the same as Anderson, she can make out a wage discrimination claim because she was assigned to do more work. Specifically, Johnson alleges that she was given academic advising duties that Anderson was not given. Reviewing the record, we find that both Johnson and Anderson were sometimes, though not always, given academic advising duties. More importantly, UWEC has asserted that when Johnson was given academic advising duties, these were counted as two credits worth of teaching, i.e., she was paid separately for this work. Since Johnson does not contest this assertion, we do not address her claim of wage discrimination based on doing extra work for the same money
 
 
 [10]
 As noted above, Anderson picked up an additional section of remedial English at the last minute, giving him a 75% teaching load for fall 1992. UWEC asserts that Anderson was given this section because he was available to teach at the needed time; Johnson does not deny this claim or assert that she too was available at that time
 
 
 [11]
 That is, if the English Department wanted to retaliate through the performance review process, they could have started in the fall of 1991
 
 
 [12]
 Anderson was the only other academic staff person to receive the "good" rating, and he was not rehired for the 1993-94 academic year either