In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1693

ERNEST F. ALBIERO,

Plaintiff-Appellant,

v.

CITY OF KANKAKEE, DONALD E. GREEN, Individually,
and as Agent of City of Kankakee,
and other unknown
agents for the City of Kankakee,

Defendants-Appellees.

Appeal from the United States District Court
for the Central District of Illinois.
No. 97 CV 2138--Michael P. McCuskey, Judge.

Argued November 9, 2000--Decided April 5, 2001

  Before FLAUM, Chief Judge, and RIPPLE and KANNE,
Circuit Judges.

  RIPPLE, Circuit Judge.  Ernest Albiero brought
this action against the City of Kankakee, Mayor
Donald Green, and other unknown agents of the
City (collectively "the City"). He alleged that
his right to equal protection of the laws had
been violated when the City placed a "slum lord"
sign on his property. The district court granted
summary judgment for the City. For the reasons
set forth in the following opinion, we affirm the
decision of the district court.

I
BACKGROUND
A.

  Mr. Albiero owns several rental properties in
Kankakee. On June 11, 1997, the City placed a
sign in front of his property located at 805 S.
Third St./1 The sign read:

SLUM PROPERTY!
THE OWNER OF THIS PROPERTY:
ERNEST ALBIERO
. . .
IS IN VIOLATION OF CITY CODE
AND CHOOSES NOT TO BRING

THIS PROPERTY INTO
COMPLIANCE THEREBY
SIGNIFICANTLY CONTRIBUTING
TO THE BLIGHT IN THIS
NEIGHBORHOOD

R.14, Ex.A.

The sign was placed as part of a City policy implemented by then-Mayor Green. In April 1997, the mayor had read a newspaper article from Syracuse, New York, that described that city's placement of slum lord signs on the front lawns of various properties to encourage landlords to comply with city codes. At about the same time that Mayor Green reviewed the article, the City received a petition signed by 93 residents that complained about the condition of a rental property located at 2020 W. Station Street in Kankakee. The residents requested in the petition that the owner (not Mr. Albiero) "restore the well being of this property" and eliminate the conditions they perceived as adding blight to their neighborhood. R.32, Ex.13 at 1.

The mayor met with the city attorney, Christopher Bohlen, and various aldermen to discuss the feasibility of implementing the Syracuse program in Kankakee. Bohlen then drafted a policy to guide the City's placement of the signs. That policy provided that signs would be placed in those locations that (1) appeared dilapidated and not in compliance with applicable property maintenance codes based upon exterior appearance; (2) received repeated citations for failure to comply with the codes; (3) had been the subject of repeated complaints by neighbors; (4) had a clearly deleterious effect upon the neighborhood in which they were located.

The mayor decided to employ the program, a decision memorialized in the same memorandum written by Bohlen that explained the procedures to be followed in selecting properties for sign placement. Employing the four factors outlined in Bohlen's draft plan, Terry Lewis, the assistant chief of the City's fire department who oversees the code enforcement office, and Larry Nolan, the code official in charge of day-to-day operations, were to recommend to the mayor various properties that they thought warranted the placement of a sign. After reviewing the files on these properties, the mayor was to select no more than 15 properties. The policy further indicated that signs would be removed once a property was repaired and deemed to be in "substantial compliance with applicable codes." R.32, Ex.15.

Mayor Green initially selected five properties. He testified that the properties chosen were

those that consistently had not been in compliance with City codes. The first was the property referred to in the citizens' petition; another was Mr. Albiero's property at issue in this appeal.

B.

Mr. Albiero's property has a history of code violations. On July 2, 1996, for example, the City inspected his property and took numerous photographs showing holes in the walls, discoloration of ceiling tile that indicated leakage from the roof, and inoperative smoke detectors. Consequently, the City's fire department sent Mr. Albiero a three-page letter the next week that listed those conditions that presented fire hazards and indicated that the items must be given "immediate attention in the interest of fire and life safety." R.32, Ex.5 at 1. The letter further admonished that the dwelling had been declared "UNFIT FOR HUMAN HABITATION." Id. at 3.

A second letter was sent to Mr. Albiero on July 11, 1996, this time containing a list of code violations seven pages in length. Mr. Albiero was given 60 days to correct the violations that included the infestation of roaches and fleas, broken doors and windows, and the use of extension cords to supply electricity in apartments where the power had been turned off and propane tanks to fuel natural gas stoves in apartments where the gas had been turned off. On September 25, 1996, Mr. Albiero was issued 24 citations for ordinance violations. The Kankakee County circuit court later dismissed the citations on March 11, 1997, because they were not issued within 60 days of the inspection.

A follow-up inspection of Mr. Albiero's property was conducted on March 20, 1997. Photographs were again taken that illustrated the deplorable condition of the building. A plumbing inspection was completed the same day; the inspector found numerous problems with the plumbing in the building, including a lack of water in some of the bathrooms and an uncapped sewer gas line. He also noted that the "entire building [was] bug & cockroach infested." R.31, Ex.10. The inspector concluded that the building remained unfit for human habitation.

On April 8, 1997, the fire department sent a third letter to Mr. Albiero, again listing numerous violations that needed to be rectified. No citations, however, were issued based upon the March 20 inspection.

C.

Before deciding to place the slum lord sign on Mr. Albiero's property on June 11, 1997, Mayor Green reviewed the information forwarded to him by Lewis and Nolan. In the file was information regarding the July 1996 and March 1997 inspections, including photographs. Mayor Green also was personally familiar with the dwelling; he passed by it "every day driving to and from work" and noted that it was "in a dilapidated condition compared to the surrounding properties." R.32, Ex.22 at 2. He saw extension cords running between windows and noted that a door on the front of the building was missing.

As of August 20, 1997, the City had erected 14 slum lord signs. By October 1998, the City had put up between 19 and 22 signs, and approximately seven had been removed because of subsequent compliance with City codes. In Mr. Albiero's case, the sign was removed following an inspection in December 1998.

D.

Mr. Albiero previously has filed lawsuits against the City. These suits were related to his ownership of property; as the district court explained in an earlier order, Mr. Albiero "has tangled with the various Kankakee city officials a number of times over various issues such as inspections, permits, repairs, etc." R.11 at 1. Many of these disputes have made their way to state or federal court. See Albiero v. City of Kankakee, No. 97-2759, 1998 WL 416531 (7th Cir. June 16, 1998) (affirming the dismissal of three separate cases filed in the district court); Albiero v. City of Kankakee, 122 F.3d 417 (7th Cir. 1997) (affirming the dismissal of a case filed in the district court); Albiero v. City of Kankakee, No. 3-95-0487 (Ill. App. Ct. 1996) (rejecting a challenge to the constitutionality of a City ordinance that required the inspection of residential rental units).

E.

Mr. Albiero brought this present action against the City in June 1997, alleging violations of the Fourth and Fourteenth Amendments of the United States and Illinois constitutions, illegal use of motor tax revenue, and defamation, all relating to the City's placement of the slum lord sign on his property. The district court dismissed the majority of the claims but granted leave to file within 30 days an amended complaint stating any remaining claims.

Mr. Albiero filed an amended complaint in December 1997. In that complaint, Mr. Albiero

alleged an equal protection violation; specifically, he indicated that the sign placement was "premeditated and malicious, and done with the sole intent to embarrass, harass, and humiliate the Plaintiff in retaliation for the filing of prior lawsuits against the City of Kankakee." R.14 at 7. He asserted that he was entitled to damages pursuant to 42 U.S.C. sec. 1983 for the City's malicious and retaliatory act of placing the sign on his property. He also alleged a state-law defamation claim.

The City filed a motion to dismiss, which the district court granted only as to the defamation claim. As for the equal protection claim, the district court determined that the amended complaint alleged a claim for selective prosecution/malicious retaliation as outlined by the Seventh Circuit in Esmail v. Macrane, 53 F.3d 176 (7th Cir. 1995).

In June 1999, the City filed a motion for summary judgment. The district court granted the City's motion; it concluded that Mr. Albiero had not presented enough evidence to create a genuine issue of material fact regarding his claims that (1) the City had singled him out for differential treatment when it placed the slum lord sign on his property and (2) the City's action was in retaliation for the prior litigation between the parties and was wholly unrelated to any legitimate state objective.

II
ANALYSIS
A.  Standard of Review

We review de novo the district court's decision to grant summary judgment to the City. See Bellaver v. Quanex Corp., 200 F.3d 485, 491 (7th Cir. 2000). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, we must view the record in a light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The evidence must create

more than "'some metaphysical doubt as to the material facts.'" Johnson v. University of Wisconsin-Eau Claire, 70 F.3d 469, 477 (7th Cir. 1995) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). A mere scintilla of evidence in support of the nonmovant's position is insufficient, see Liberty Lobby, 477 U.S. at 252; a party will be successful in opposing summary judgment only when it presents "definite, competent evidence to rebut the motion." EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 437 (7th Cir. 2000) (citation and quotation marks omitted).

B. Equal Protection Claim
1.

The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

Under our circuit precedent, an individual also may state a claim under the Equal Protection Clause if he can show that state government took an action that "was a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." Esmail v. Macrane, 53 F.3d 176, 180 (7th Cir. 1995). The Equal Protection Clause provides a remedy when a "powerful public official pick[s] on a person out of sheer vindictiveness." Id. at 178. This type of discrimination has been characterized as the creation of a "class of one." Indiana State Teachers Ass'n v. Board of Sch. Comm'rs, 101 F.3d 1179, 1181-82 (7th Cir. 1996). To prevail, the plaintiff must demonstrate that the government is treating unequally those individuals who are prima facie identical in all relevant respects, see id., and that the cause of the differential treatment is a "totally illegitimate animus toward the plaintiff by the defendant." Olech v. Village of Willowbrook, 160 F.3d 386, 388 (7th Cir. 1998), aff'd on other grounds, 528 U.S. at 565. If the "defendant would have taken the complained-of action anyway, even if it didn't have the animus, the animus would not condemn the action." Id. Ill will must be the sole cause of the complained-of action. See id. A showing of "uneven law enforcement," standing alone, will not suffice. Id.

2.

The district court determined that the evidence presented by Mr. Albiero was insufficient to

preclude summary judgment. The court noted that Mr. Albiero did not present "any competent evidence" that the City singled him out for differential treatment when it placed the slum lord sign on his property; nor did he show that the City's actions were a "spiteful effort to 'get' him in retaliation for the prior litigation between the parties and was wholly unrelated to any legitimate state objective." R.41 at 11-12.

a.

Mr. Albiero cannot maintain an equal protection claim because, most fundamentally, he has not offered any evidence that he was treated differently from other similarly situated rental landlords. Indeed, Mr. Albiero was treated like other landlords, at least like the other 20 or so landlords who received the slum lord signs. The record contains no evidence that Mr. Albiero's property was in a better condition than the other locations where signs were placed. The City inspected his property on two separate occasions--in July 1996 and March 1997--and found it to be in a deplorable state both times. These conclusions were detailed in reports, photographs, and in the three separate letters that the City sent to Mr. Albiero. In short, on this record, Mr. Albiero was treated no differently than the other landlords whose properties ran afoul of the City's policy.

Mr. Albiero does little to help his case, as he must when confronted with a summary judgment motion. See Fed. R. Civ. P. 56(e). He offers no evidence that he was singled out for unfair treatment; more precisely, he does not demonstrate that the lamentable state of his property was corrected before the sign was erected. Mr. Albiero puts forth only his own affidavit that no violations existed in June 1997, based not on a personal inspection but on a policy of repairing any violations within 72 hours. He also avers in conclusory fashion that there were numerous inspections of the building thereafter that evidenced no violations.

Under our precedent, these conclusory statements, unsupported by the evidence of record, are insufficient to avoid summary judgment. We repeatedly have held that "[s]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment." Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993); see also Drake v. Minnesota Mining & Mfg. Co., 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it

requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.") (citation and quotation marks omitted). We require that the party opposing the motion take reasonable steps to provide the district court sufficient evidence to create a genuine issue of material fact. See Shank v. William R. Hague, Inc., 192 F.3d 675, 683 (7th Cir. 1999); see also Schacht v. Wisconsin Dep't of Corr., 175 F.3d 497, 504 (7th Cir. 1999) (indicating that summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events").

Mr. Albiero cannot meet his burden on summary judgment merely by averring that he followed a repair policy. He must point to evidence in the record that indicated that he was treated differently than other similarly situated landlords, and this he does not do. See Indiana State Teachers Ass'n, 101 F.3d at 1181-82. Mr. Albiero has offered no photographs, independent inspection reports, or other evidence that would tend to establish that the sign was erected even though the property did not meet the criteria of the program as stated in the city attorney's memorandum./2

b.

There is certainly no concrete evidence that the City picked on Mr. Albiero "out of sheer vindictiveness." Esmail, 53 F.3d at 178. Mr. Albiero's submission that the City acted solely out of vindictiveness for his having brought other litigation against the City is pure speculation. On the contrary, the record shows that the City took action against Mr. Albiero's property because it was in a dilapidated condition. Mr. Albiero has offered no concrete evidence to support his assertion that the City did not make its decision pursuant to an established policy and under an established procedure.

Conclusion

In opposing the summary judgment motion of the defendants, Mr. Albiero did not present sufficient evidence to create a jury question as to whether the City of Kankakee singled him out for unfair treatment when it placed a slum lord sign on his property. Accordingly, we must affirm the judgment of the district court.

AFFIRMED

/1 The 3′ by 5′ sign was erected on the parkway between the sidewalk running in front of the property and the facing street.

/2 We note that the city attorney's memorandum does not make the issuance or adjudication of a formal code violation an absolute prerequisite to the inclusion of a building in the signage program.