Barbara **SCHNEIDER**, Plaintiff,

v.

**NORTHWESTERN UNIVERSITY,**
Defendant.

No. 92 C 7080.

United States District Court,
N.D. Illinois,
Eastern Division.

May 13, 1996.

Laurie Ellen Leader, Leader & Associates, Ltd., Northbrook, IL, Keith L. Hunt, Keith L. Hunt & Associates, P.C., Chicago, IL, for plaintiff.

Lawrence I. Kipperman, Patrick Scott Casey, Sidley & Austin, Chicago, IL, Michael C. Weston, Northwestern University, Evanston, IL, Stephanie Mills Graham, Northwestern University, Evanston, IL, for defendant.

## MEMORANDUM AND ORDER

LINDBERG, District Judge.

Plaintiff, Barbara Schneider, filed a complaint alleging that defendant, Northwestern University, committed sex discrimination and retaliated against her in violation of Title VII, 42 U.S.C. § 2000e, et seq., when defendant denied her tenure and failed to promote her from assistant professor to associate professor.

The evidence in this bench trial was heard over 27 days between November 7, 1994, and March 1, 1995. Although the parties includ-

ed proposed findings of fact and conclusions of law in the final pretrial order (FPTO), USDistCt, NDIll, Model FPTO, they were inadequate to the court's purposes in light of the evidence adduced and the rulings made at trial. Therefore, the parties were required to submit post-trial proposed findings of fact and conclusions of law. In addition to following this court's guidelines for such proposed findings and conclusions, see USDistCt, NDIll, Guidelines for Proposed Findings of Fact and Conclusions of Law, the parties were required to cite to the record to support their proposed findings of fact and, in defendant's case, any denials of plaintiff's proposed findings of fact. The parties submitted their proposed findings of fact and conclusions of law in May of 1995. The court granted plaintiff's motion for oral closing arguments on June 6, 1995. However, due to various scheduling difficulties, closing arguments were not held until October 10, 1995. The court now renders its decision.

## FINDINGS OF FACT

There are 107 numbered paragraphs in plaintiff's proposed findings to which defendant has responded with answering proposals. Some of defendant's answering proposals respond to multiple consecutive paragraphs of plaintiff's proposed findings. The court will follow the lead of the parties and, so far as possible, state its findings in paragraphs numbered to correspond with the numbered paragraphs in plaintiff's proposed findings and defendant's answering proposals. In a few instances, the court's findings will not lend themselves to exact correspondence with plaintiff's proposed findings.

The court makes the following findings of fact:

1. Plaintiff, Barbara L. Schneider, is a female citizen of the United States who resides within this judicial district. At all times relevant and material to this action, plaintiff was an "employee" of defendant Northwestern University within the meaning of Title VII.

2. Defendant Northwestern University is a private university with its main campus located in Evanston, Illinois. At all times relevant and material to this action, defendant employed more than 15 employees and therefore was an "employer" within the meaning of Title VII.

3. Tenure is a faculty appointment for an unlimited term. The primary purpose of tenure is to protect academic freedoms. Once tenure is conferred, a faculty member may only be dismissed for gross misconduct.

4. Defendant's Board of Trustees has the ultimate authority to grant tenure.

5. The dean, the provost, and/or the Board of Trustees have the authority to deny tenure. A dean's decision to deny tenure is final unless the tenure candidate appeals the dean's denial to the University Faculty Reappointment, Promotion, Tenure and Dismissal Appeals Panel (UFRPTDAP) or to the provost. Thus, although the dean's action in this regard is often referred to as a "recommendation to deny tenure," it is in fact defendant's decision to deny tenure unless successfully appealed. See *Lever v. Northwestern University*, 979 F.2d 552 (7th Cir1992). Ordinarily, the University President is not involved in a decision to deny tenure.

6. Tenure candidates may appeal a dean's decision to deny tenure to UFRPTDAP or to the provost. An appeal to UFRPTDAP is made on the grounds of improper procedure. If an appeal to UFRPTDAP is taken, the provost defers his decision on the appeal until UFRPTDAP has submitted its recommendation to him.

7. Northwestern's Schools and Colleges may establish their own tenure procedures within this framework.

8. Northwestern's School of Education, later renamed the School of Education and Social Policy (hereafter referred to as the "School of Education" or the "School"), established tenure procedures that governed each of plaintiff's tenure reviews. Plaintiff was first reviewed for tenure during the 1984–85 academic year. She was again reviewed for tenure during the 1985–86 academic year. In each of those years, a male received tenure and promotion to the associate professor level when plaintiff was denied tenure. Specifically, Bruce Spencer was ten-

ured in 1985, and Dan Lewis was tenured in 1986. During the period in which plaintiff was employed by defendant and David Wiley was dean of the school, there were five other tenure reviews; Karen C. Fuson and Diana Slaughter were granted tenure in 1979–80, Michael Piechowski was denied tenure in 1982–83, Elizabeth Sulzby was granted tenure in 1982–83, and Fay L. Cook was granted tenure in 1984–85. Plaintiff's 1986 denial of tenure is the subject of this action.

9. The School of Education's procedures involved a multi-level tenure review process. That process culminated in the dean either denying tenure or recommending to the provost that tenure be granted.

10. Faculty members at Northwestern are ranked in the following descending order: professors; associate professors; assistant professors; instructors; and lecturers, research associates, and teaching associates and assistants. Generally, professors and associate professors are appointed with tenure. All other faculty members are appointed without tenure for limited terms.

11. Full-time service in the faculty ranks of instructor, assistant professor, and associate professor count toward tenure accumulation. Service in the ranks of lecturer and research associate is not "tenure accumulating."

12. Northwestern adheres to the principles of the American Association of University Professors (AAUP) regarding the de facto grant of tenure. Tenure at Northwestern is acquired de facto in the seventh year of a faculty member's full-time service in tenure-accumulating ranks, unless the faculty member receives notice during the sixth year that the seventh year of employment will be "terminal." Tenure de facto is automatic. It is conferred without a tenure review solely by reason of the faculty member's appointments.

13. To avoid tenure de facto, an assistant professor is typically reviewed for tenure during his or her sixth year of employment.

14. Most junior faculty hired by Northwestern are appointed as assistant professors for an initial three-year term. At the end of that three-year period, an assistant professor is reviewed for reappointment to a second three-year term. A tenure review typically occurs during the sixth year of the assistant professor's employment (i.e., the last year of the second three-year term). If an assistant professor is granted tenure, the term of the appointment is for an indefinite period. Assistant professors are typically promoted to the rank of associate professor when tenure is conferred. If an assistant professor is denied tenure, the seventh year of employment is designated as his or her "terminal year," that is, the individual's employment terminates at the end of the seventh year.

15. David Wiley was the dean of Northwestern's School of Education from April 1979 through August 1992. Three tenure review procedures applied to tenure reviews conducted in the School of Education during Wiley's deanship; the 1979 procedures; the 1981 procedures; and the 1984 procedures.

16. The 1984 procedures governed each of plaintiff's tenure reviews. With respect to her 1984–85 review, Dean Wiley gave plaintiff a choice and she chose to have the 1984 tenure review procedures, instead of the 1981 procedures, apply, except that she was allowed to, and did, elect to have a program review conducted with respect to her teaching and service.

17. A comparison of the 1984 procedures with the pre–1984 procedures does not reveal that the School of Education faculty relinquished control over tenure review to the dean in 1984. It does reveal that one of the many levels of review in the process was eliminated and that the required composition of ad hoc committees was altered somewhat.

18. Prior to 1984, a tenure candidate in the School of Education submitted materials to his or her program area for review. The program area evaluated the candidate's materials, solicited peer reviewer letters (from scholars in the candidate's field) and drafted a written report recommending that tenure be granted or denied. The report was submitted to the Faculty Personnel Review Committee (FPRC), a six-person elected faculty committee with oversight responsibility for the tenure review process. The dean then selected an ad hoc committee to review the program area's report. The dean and

the FPRC reviewed the *ad hoc* report for completeness. Once accepted on that basis, the report was sent to the candidate to present additional evidence to the FPRC in oral or written form. The FPRC then considered all of the evidence (the *ad hoc* report and the candidate's materials) and made a recommendation to grant or deny tenure to the dean and the tenured faculty of the School of Education. The tenured faculty also made a recommendation to accept or reject the *ad hoc* report to the dean, who made the ultimate decision at the School level either to deny tenure or to recommend granting tenure.

19. The School of Education faculty and not Dean Wiley requested and approved the changes in the School's tenure review procedures from 1979 to 1981 to 1984. The 1984 procedures eliminated the formal program area review because the review was redundant in view of the *ad hoc* committee review and made the tenure review process too long. Under the 1984 and pre–1984 procedures, the dean selected the *ad hoc* committee members. The pre–1984 procedures required the dean to appoint one *ad hoc* committee member from the FPRC whereas the 1984 procedures required the dean to appoint one *ad hoc* committee member from the candidate's program area. In addition to selecting a faculty member from plaintiff's program area, Dean Wiley selected an FPRC member to serve on plaintiff's 1985 and 1986 tenure *ad hoc* committees. The *ad hoc* committee's role did not change under the 1984 procedures from the pre–1984 procedures.

20. Once the *ad hoc* committee submitted its report, the 1984 procedures were almost identical to the earlier procedures. The candidate was given an opportunity to comment on the *ad hoc* report. The FPRC and the tenured faculty in the School of Education then either accepted or rejected the *ad hoc* committee's recommendations, and, ultimately, the dean either decided to deny tenure or made a recommendation to the provost to grant tenure in the particular case.

21. Under both the pre–1984 and the 1984 procedures, the dean's office played a central role in all tenure reviews. The dean collected the candidates' materials, selected the *ad hoc* committee, disseminated the materials to the *ad hoc* committee, contacted peer reviewers on the *ad hoc* committee's behalf, and collected the peer reviews and disseminated them to the *ad hoc* committee.

22. Not all individuals reviewing a tenure candidate had equal access to information. In an effort to maintain confidentiality, only the *ad hoc* committee members and the dean had access to a tenure candidate's unredacted peer review letters. The *ad hoc* report was made available to the dean, the candidate, and the FPRC. The Senior School Faculty does not receive peer review letters, though they do review the *ad hoc* committee report at the meeting in which they vote on a candidate's tenure qualifications.

23. The dean's selection of the *ad hoc* committee could conceivably affect the outcome of a tenure review. Selection of committee members who were personally biased, either in favor of or against, a tenure candidate could affect the result. Selection of committee members who had unusually high standards or unusually low standards for a favorable recommendation could also affect the result. However, given the subsequent review of the *ad hoc* committee's report by the FPRC and the Senior School Faculty, senior academics likely to be determinedly independent in their judgments, such selection of an *ad hoc* committee would by no means assure a particular tenure outcome.

24. A tenure outcome could also conceivably be affected by sending a less than adequate or representative sample of a candidate's work to peer reviewers. This too would not necessarily assure a particular tenure outcome. Some or all of the peer reviewers could be familiar with the candidate's work and so not be limited in their information. Also, the unredacted letters would be reviewed by the *ad hoc* committee, and the FPRC and Senior School Faculty would consider the excerpts from the letters used to support the conclusions contained in the *ad hoc* committee report in making their decisions. However, given the near unanimity of good reviews normally necessary for tenure at Northwestern, the outcome of a tenure review might in some instances be affected by sending a less than adequate or represen-

tative sample of a candidate's work to peer reviewers.

25. Tenure candidates are evaluated in three areas: teaching, service (within the institution and to the academic community), and scholarship. Of these, scholarship was the most important criterion for tenure within the School of Education.

26. Under the School of Education's 1984 procedures, a tenure candidate's scholarship was initially reviewed by the *ad hoc* committee and by peer reviewers (scholars in the candidate's field). Dean Wiley used the candidate's publication record in first-tier journals, the evaluations of external peer reviewers, and the *ad hoc* committee's, the FPRC's, and the Senior School Faculty's recommendations to cross-validate his own conclusions about the candidate's scholarship and qualifications for tenure.

27. A candidate's scholarship was reviewed in terms of quality and quantity. The ultimate question for tenure was whether the candidate would be "a substantial and important contributor to his or her field of scholarship in the future." In order to merit tenure at Northwestern, a candidate's scholarship must meet the highest professional standards in the candidate's discipline and the candidate must have an established record of scholarly achievement.

28. Plaintiff's teaching and service were not at issue during her 1986 tenure review.

29. Northwestern denied plaintiff tenure on the basis of the quality of her scholarship including the failure to have articles accepted by and published in first-tier refereed journals.

30. Plaintiff began her academic career at Northwestern as an instructor in the School of Education on September 1, 1977. Effective September 1, 1979, she was promoted to the rank of assistant professor. Plaintiff continued as an assistant professor until she was terminated by Northwestern after she failed to attain tenure and promotion to the rank of associate professor during the 1985–86 academic year. Her employment officially ended on August 31, 1987.

31. Under Dean Wiley, there were four program areas in the School of Education:

(1) Administration and Policy Studies; (2) Counseling Psychology; (3) Human Development and Social Policy; and (4) Teaching–Learning Processes. Plaintiff's program areas was "Administration and Policy Studies."

32. During the first six years of her employment at Northwestern, plaintiff held administrative titles along with her faculty appointments. Plaintiff was director of the Dean's Network—a consortium of deans of schools of education from 21 colleges and universities—from 1977 until 1981. B.J. Chandler, David Wiley's predecessor, first appointed plaintiff to that position which she continued to hold under Dean Wiley. Dean Wiley appointed plaintiff to the newly-created position of Assistant Dean for Research in 1979. Plaintiff held the title of Assistant Dean for Research from 1979 to 1981, and Associate Dean for Research from 1981 to 1983.

33. Plaintiff's administrative positions impeded her ability to devote full time to scholarship. During the period of 1979 to 1981, plaintiff averaged an 80–hour workweek with fifty per cent of her time devoted to the assistant deanship and the remaining fifty per cent of her time divided equally between the Dean's Network and her scholarship. Plaintiff's work as director of the Dean's Network also provided her with contacts with deans and other faculty members in Schools of Education and during that time she did pursue research with the intent of having the research published. Plaintiff's positions as Assistant and Associate Dean of Research also exposed her to colleagues' scholarship. Dean Wiley allowed plaintiff to resign from the Dean's Network and limit her administrative responsibilities as an associate dean to 20 hours per week so that she could devote more time to her scholarship.

34. Prior to Dean Wiley's hire, plaintiff began her employment at Northwestern in a full-time administrative capacity although she also held a faculty rank. Because the funding for her initial positions at Northwestern came entirely from outside of the School's faculty budget, plaintiff received a series of one-year contracts instead of the typical three-year faculty appointment of assistant

professor. After plaintiff expressed interest in becoming a full-time faculty member and being considered for tenure in the School, Dean Wiley, without taking a vote of the Senior School Faculty but believing he had their agreement, granted plaintiff's request by placing her on tenure track in April 1981 so that she could be considered for tenure. At that time, Dean Wiley also placed Lee Blum on tenure track. ·

35. Beginning in 1980 orally, and in 1981 in writing, plaintiff requested relief from her administrative responsibilities so that she could devote full-time to scholarship. Dean Wiley for a period of time declined those requests on the ground that plaintiff's faculty appointment was contingent on her administrative appointment. Upon Dean Wiley's approval, plaintiff resigned from her position as director of the Dean's Network effective June 30, 1981. Plaintiff also expressed interest in resigning from her Assistant Dean of Research position during that time. Dean Wiley could not grant plaintiff's request at that time because plaintiff's faculty appointment was predicated upon her administrative responsibilities in that there were not sufficient resources in the faculty budget at that time to shift her position to a regular faculty appointment.

36. In 1983, Dean Wiley granted plaintiff's request to resign from her Associate Dean of Research position because faculty members had enough experience in the grant application process by that time to assume plaintiff's responsibilities on their own. Plaintiff's 1983 reappointment *ad hoc* committee recommended that "efforts should be made to insure that her nonresearch duties are minimal." Dean Wiley did not relieve plaintiff of her administrative duties solely because of that advice, although it was a contributing factor.

37. Administrative duties in the School were not gender-related and did not of themselves preclude a faculty member from ultimately obtaining tenure. Fay Cook, a female faculty member who had administrative duties prior to her tenure review, obtained tenure; male faculty members such as Malcolm Bush, Martin Gill, Michael Rapp, and David Florio who had administrative duties did not obtain tenure; and Michael Piechowski, a male faculty member who did not have administrative duties did not obtain tenure. During David Wiley's deanship, no male assistant professors ever held administrative titles while on tenure track.

38. When David Wiley became dean, he appointed Margaret Lee, at that time the only tenured female full professor on the faculty, to fill the newly-created position of Associate Dean for Student Affairs. That position focused on undergraduate students in the School of Education. Dean Wiley also appointed Richard Lesh, a tenured male faculty member, to an administrative position.

39. Prior to Dean Wiley's hire, Lee Blum began her Northwestern employment in an administrative capacity as head of the School's Master's Training Program in Counseling Psychology and also held a faculty rank. In April 1981, Dean Wiley placed Lee Blum on tenure track. At Ms. Blum's request, Dean Wiley appointed a special *ad hoc* committee regarding her chances of obtaining tenure. This committee, chaired by Elizabeth Sulzby, issued a report informing Ms. Blum that her chances of obtaining tenure were slim. After reviewing the report, Ms. Blum withdrew her candidacy for tenure and made arrangements with Dean Wiley for an administrative appointment, coterminus with a courtesy appointment as assistant professor in the School. In order to obtain these appointments, Ms. Blum was asked by Dean Wiley to forfeit any right to tenure she might have; in his thirteen years as dean, David Wiley never asked a male faculty member to forfeit any tenure rights. Ms. Blum still holds these appointments, with the exception that she has been promoted from assistant to associate professor.

40. There was some disagreement between practice in the School of Education and the policy of Northwestern, as expressed by the provost, as to when an individual was on tenure track. In the School of Education, the practice was that an individual could be appointed instructor or assistant professor under some circumstances and yet not be on tenure track. As far as the provost was concerned, being appointed to a tenure-accumulating position (i.e., instructor, assistant

professor, associate professor, or professor) was synonymous with being on tenure-track—in fact, was how one got on tenure track—and an individual who was not in a tenure-accumulating position (i.e., who was not on tenure track) should not be called instructor or assistant professor while a full-time administrator. Dean Wiley did not understand tenure accumulation until some time in the process of determining plaintiff's status for purposes of tenure when she was placed on tenure track. The result of the combination of the School of Education's practice and Northwestern's policy as expressed by the provost has been for the School of Education to partially divorce tenure-accumulation from tenure track, making it possible in some cases for time to count toward tenure (i.e., for the position to be tenure-accumulating) at a time when it is understood that there is no commitment by the School of Education that it will consider the individual for tenure and that the individual has no right to be reviewed for tenure (i.e., at a time the individual is not on tenure track).

41. A faculty vote is generally required to be appointed to a tenure-accumulating position, and was held for initial appointments during Dean Wiley's administration. Under the School of Education's practice, a vote of the faculty has not always been a requirement to place an individual on tenure track. It is, however, very unusual for an individual to be placed on tenure track without a vote of the senior faculty. Some members of the faculty were upset when Dean Wiley placed plaintiff and Lee Blum on tenure track without a faculty vote, as evidenced by the statement of James Hall: "Wiley, this is another one of your pronouncements.... What you are doing here, Wiley, is taking these two women and putting them in a lifeboat in the middle of Lake Michigan, then sticking a hole in it and watching them drown."

42. Plaintiff and Lee Blum were unaware that they had been in tenure-accumulating positions prior to Dean Wiley's informing the faculty that they were being placed on tenure track. Dean Wiley, also, was unaware of this.

43. Plaintiff believed Dean Wiley when he told her prior to April 1981 that she was not on tenure track. Dean Wiley told plaintiff that a tenure track offer from another research university would lend credence to her desire to be placed on tenure track. Plaintiff obtained an offer from UCLA. That offer was not communicated to the faculty at the April 1981 meeting when Dean Wiley announced that plaintiff and Lee Blum were being placed on tenure track. No male faculty member was ever required to obtain a tenure track offer as a prerequisite to a tenure track appointment.

44. Plaintiff's non-typical employment history at Northwestern required Dean Wiley to calculate the amount of plaintiff's tenure accumulation in order to determine the length of her 1983 reappointment as an assistant professor. Dan Lewis's atypical one-year employment contracts similarly necessitated a review of his tenure accumulation status in 1983 in order to determine when he might be reviewed for tenure. Because of the interplay between the School of Education's practice and Northwestern's policy as expressed by the provost with respect to tenure accumulation and tenure track, a faculty member's time toward tenure accumulates based on the faculty member's rank independently of whether the Senior School Faculty have agreed that the faculty member is on tenure track and will be considered for tenure. This interplay, previously unknown to both plaintiff and Dean Wiley, resulted in plaintiff and Dean Wiley being surprised to discover that because plaintiff had held the faculty rank of instructor at Northwestern as early as the fall of 1977, the 1983–84 academic year normally would have been her terminal year under the AAUP guidelines and Northwestern's policy.

45. If all of plaintiff's time in faculty ranks beginning in 1977 counted toward tenure, it would mean that, if plaintiff were not reviewed for tenure in 1983–84, she would receive tenure *de facto*. Dean Wiley did not want plaintiff, or anyone else, to receive tenure *de facto*.

46. In order to accommodate plaintiff's desire to be considered for tenure, stop the tenure clock, and allow plaintiff time to de-

vote solely to her research and tenure preparation, Dean Wiley offered to place plaintiff on a non-tenure accumulating research associate leave for the 1983–84 academic year. Plaintiff would retain her faculty title of assistant professor but would take a leave of absence from that position for one year. The research associate position was not a demotion and plaintiff would lose no pay. Plaintiff was not happy about this, but initially accepted the research associate position and Dean Wiley notified her prior to August 31, 1993 (the end of her sixth year) that the 1984–85 academic year would be her terminal year at Northwestern and that she could request a tenure review at any time prior to August 31, 1985.

47. Plaintiff appealed to Provost Mack requesting that Northwestern not count the 1977–78 and 1978–79 academic years as tenure-accumulating because Northwestern employed plaintiff solely in an administrative capacity as Director of the Dean's Network and she did not teach any courses those years. By letter dated September 16, 1983, Provost Mack granted plaintiff's request thus extending the time until 1985 for Northwestern to review her for tenure. Plaintiff then withdrew her acceptance of the research associate appointment. At the end of the fall quarter, plaintiff wrote to Provost Mack to request that the 1979–80 academic year also not count toward tenure because she was still performing administrative duties then, but Provost Mack denied this request because she was doing sufficient teaching during that year for it to be tenure accumulating.

48. Plaintiff was first reviewed for tenure in the Spring of 1985 during the 1984–85 academic year. This review occurred nearly seven and one-half years after she was first employed by Northwestern, two years after she had resigned as associate dean, and four years after she had been placed on tenure track by Dean Wiley.

49. The timing of the tenure review meant that plaintiff's scholarship would be reviewed before the Newcomers Study was completed. The Newcomers Study was a longitudinal study of blacks in four private urban elementary schools. Plaintiff and Diana Slaughter were the co-principal investigators of that study.

50. The Newcomers Study was based on a grant obtained from the National Institute of Education in 1983. Plaintiff's 1983 *ad hoc* committee that reviewed her for reappointment advised plaintiff as follows: "The implications are clear: Concentrate energies on one or two well defined projects which are likely to lead to visible publications of quality. The Newcomers Study seems to be the obvious best bet. Nevertheless, the question remains, can it be completed and recognized as a substantial contribution by the time of her tenure review." The Newcomers Study was completed in 1986. Only portions of that study were completed in time for plaintiff's first tenure review. In the opinion of certain members of the 1985 and 1986 *ad hoc* committees, plaintiff did not follow the advice of the 1983 *ad hoc* committee to concentrate her energies on one or two projects likely to result in visible publications of quality.

51. Dean Wiley knew that the Newcomers Study was the focus of plaintiff's scholarship between 1983 and 1986. He considered the Newcomers Study to be "a significant study ... that ... was making important and novel contributions to the field." However, Dean Wiley was "not willing to make a statement about the report [of the Newcomers Study submitted in 1986]."

52. Dean Wiley appointed Claude Mathis to chair plaintiff's 1985 *ad hoc* committee. As chair, Mathis was responsible for drafting the 1985 *ad hoc* report, which recommended against plaintiff's tenure. Mathis was a tenured professor in the School of Educations and the coordinator of plaintiff's program area—Administration and Policy Studies. Plaintiff talked to Mathis about the report, not knowing at the time that he was on the *ad hoc* committee. He said to her, "Barbara, why are you worried about this. Why don't you just go home and have some more babies." Mathis had made similar statements to plaintiff on other occasions and a similar statement about going home and having babies instead of finishing her dissertation to a female graduate student named Trudie Tarkington.

53. At the time of plaintiff's first tenure review, there were no female tenured faculty assigned to her program area on a full-time basis. The male tenured faculty assigned to Administration and Policy Studies were: Claude Mathis, Robert Church, Lee Anderson, William Hazard, John Wick, and Dean Wiley.

54. Karen Fox was a female assistant professor who was assigned to the Administration and Policy Studies program area on a full-time basis in the late 1970s who voluntarily left Northwestern to take a position at another university prior to being reviewed for tenure. Fay Cook, a female assistant professor, was assigned to the Administration and Policy Studies program area during plaintiff's employment and was reviewed for and granted tenure during the time of plaintiff's first tenure review, the 1984–85 academic year. No other female assistant professors were eligible to receive tenure in that program area during the ten years of plaintiff's employment.

55. Bruce Spencer, a male assistant professor, was tenured in the area of Administration and Policy Studies during the 1984–85 academic year.

56. After reviewing plaintiff's tenure materials in the Spring of 1985, including her written papers, curriculum vita, peer review letters, the *ad hoc* committee's and the FPRC's unanimous recommendations that plaintiff not be granted tenure, and the Senior School Faculty's split vote, Dean Wiley determined that plaintiff did not have the near unanimity of support of her scholarship necessary for an award of tenure at Northwestern. Dean Wiley therefore decided to deny plaintiff tenure and promotion in 1985 and informed plaintiff that 1985–86 would be her terminal year. Plaintiff appealed that decision to UFRPTDAP on the ground that the tenure review was premature. The UFRPTDAP panel recommended that plaintiff be re-reviewed for tenure during the 1985–86 academic year based on conflicting interpretations plaintiff received concerning when her tenure began to accumulate. The provost accepted UFRPTDAP's recommendation, and plaintiff was re-reviewed for tenure in 1986.

57. Under Dean Wiley's deanship, only plaintiff received two tenure reviews. Karen Fuson received two tenure reviews, but only the second was under Dean Wiley.

58. Karen Fuson was initially denied tenure in 1977–78. Her first tenure review occurred very early, after only two years of employment at Northwestern under former Dean B.J. Chandler. She subsequently married James Hall, a tenured full professor in Northwestern's School of Education. After her marriage to Hall, Dr. Fuson attained tenure upon Dean Wiley's recommendation effective September 1, 1980. Dean Wiley recommended that Northwestern grant Karen Fuson tenure because his evaluation was that she was an extraordinarily high quality scholar. Her marriage to James Hall had nothing whatsoever to do with Northwestern's decision to grant her tenure.

59. Plaintiff wanted her second tenure review to be untainted by the first. To this end, Dean Wiley granted plaintiff's requests to have a completely different *ad hoc* committee for her second tenure review and to be relieved from her teaching duties during the Spring Quarter of 1986. Dean Wiley also delayed plaintiff's tenure review process until the beginning of the Spring Quarter, instead of requiring her to submit her tenure materials the previous fall. Dean Wiley did, however, provide plaintiff's 1986 *ad hoc* committee with her 1984–85 *ad hoc* committee report and peer review letters at the request of the committee, contrary to her wishes.

60. All members of plaintiff's 1986 *ad hoc* committee had prior contact with the candidate. Dean Wiley selected Robert Church, Karen Fuson, Oswald Werner, and Andrew Gordon. Dean Wiley chose Robert Church and Karen Fuson as members of the committee because he highly respected their judgment and intelligence. Dr. Church was a member of plaintiff's program area and Dr. Fuson was a member of the FPRC. Dean Wiley chose Andrew Gordon as a member of the committee because his expertise on social organizations and effectiveness of social programs overlapped with plaintiff's areas of research in school organization. Dean Wiley chose Oswald Werner as a member of the

committee because his work on social organization issues and urban programs was related to plaintiff's areas of study.

61. Robert Church and Karen Fuson knew plaintiff as a fellow faculty member in the School of Education. Robert Church was also a friend of plaintiff. She was very supportive when he was going through a difficult divorce from his first wife, and he and his second wife socialized on occasion with plaintiff and her husband. Robert Church entered the assignment of serving on plaintiff's 1986 tenure *ad hoc* committee thinking it was going to be an easy recommendation to grant tenure. On at least one occasion Karen Fuson's husband, James Hall, made sexual gestures toward plaintiff. Karen Fuson did not witness James Hall making sexual gestures toward plaintiff or anyone else.

62. Oswald Werner also knew plaintiff before he served on her 1986 *ad hoc* committee. Werner was a full professor in the Anthropology Department of Northwestern's College of Arts and Sciences. Werner and plaintiff had co-chaired the dissertation committee of a graduate student named Yung Suk Lee in 1983–84. Dr. Werner thought it inappropriate for plaintiff to list herself on her 1986 curriculum vita as the first author of a proposed book that was based upon Ms. Lee's dissertation. Werner also served as a peer reviewer in plaintiff's 1985 tenure review. He then characterized plaintiff's tenure case as borderline based on the number of her publications. At about the same time, Dean Wiley recommended Dr. Werner for a courtesy appointment in the School of Education. It is uncertain whether Dean Wiley knew that Dr. Werner reviewed plaintiff in 1985 at the time he asked Dr. Werner to serve on plaintiff's 1986 *ad hoc* committee. Dr. Werner's review of plaintiff in 1985 had no conscious impact on his judgment of her scholarship in 1986, and there is no evidence that it had any unconscious impact on Dr. Werner's judgment.

63. At the time Dean Wiley appointed Andrew Gordon to serve on plaintiff's *ad hoc* committee Dr. Gordon knew plaintiff. Dr. Gordon's familiarity with plaintiff in part derived from the fact that he served on the *ad hoc* committee for plaintiff's reappointment. His wife, Margaret Gordon, had chaired the UFRPTDAP committee that considered plaintiff's appeal of Dean Wiley's earlier decision to deny plaintiff tenure. From Dr. Gordon's testimony, it was evident that he did not have an independent recollection of when Dean Wiley contacted him about being on the committee—the best he could do was state his belief that it was in the fall of 1985 because such appointments are always made in the fall. Robert Church recalled that he was contacted by Dean Wiley about being on the committee in late winter or spring of 1986. Since the appeal of the 1985 decision was not completed until November of 1985, and since the necessity of a 1986 tenure review for plaintiff was not known until the appeal was decided and the provost acquiesced in that decision, it seems most likely that Dean Wiley approached Dr. Gordon about being on the 1986 *ad hoc* committee around the same time as he approached Dr. Church in late winter or early spring 1986. Therefore, Dean Wiley asked Andrew Gordon to serve on plaintiff's 1986 *ad hoc* committee at some time after the committee on which Margaret Gordon served had completed its review of plaintiff's appeal of the 1985 decision to deny her tenure.

64. Andrew Gordon held an appointment in the Center for Urban Affairs (the Center) at the time Dean Wiley selected him to serve on plaintiff's *ad hoc* committee. Margaret Gordon was director of that Center. Dan Lewis then held a joint appointment in the Center and the School of Education. Fay Cook, a female faculty member in the School who obtained tenure effective September 1, 1985, also held a joint appointment in the Center. Plaintiff never applied for an appointment at the Center. The Center was funded primarily through public and private grants. For purposes of obtaining those grants, it would be better for all of those having appointments to the Center to be tenured than for them to be non-tenured.

65. Andrew Gordon mentored Dan Lewis. Dr. Gordon co-authored an article with Dan Lewis which was published before Dan Lewis's tenure review and was sent to his peer reviewers as part of that review. Dr. Gordon

also presented a conference paper with Dan Lewis at an annual meeting in San Francisco in 1982. Both Andrew Gordon and Margaret Gordon were contacted to serve as peer reviewers in Lewis's 1986 tenure review. Margaret Gordon was a member of Fay Cook's tenure *ad hoc* committee and Andrew Gordon was contacted as a peer reviewer for Fay Cook.

66. Dean Wiley typically did not have contact with *ad hoc* committees during their deliberations. Dean Wiley only met with plaintiff's 1986 *ad hoc* committee once or twice. It was not unusual for Dean Wiley to contact peer reviewers on behalf of an *ad hoc* committee—such contact was more likely when there was a time constraint, as was the case during plaintiff's 1986 tenure review. Because Dean Wiley had expertise in plaintiff's area of study, plaintiff's *ad hoc* committee solicited Dean Wiley's input into the selection of peer reviewers for plaintiff in 1986. After plaintiff's 1986 *ad hoc* committee selected her peer reviewers, the dean's office contacted each peer reviewer to determine whether the peer reviewer could review plaintiff's work in the short amount of time necessary to enable plaintiff's tenure review process to be completed by the end of the Spring Quarter. When the *ad hoc* committee had not received a written response from James March near the end of the process, at the *ad hoc* committee's request, Dean Wiley contacted Dr. March for his comments and passed those comments on to plaintiff's *ad hoc* committee. There was no evidence that Barbara Heyns or any other peer reviewer held a bias against plaintiff's work. There was evidence, however, that plaintiff had written and had published a negative review of a book written by Barbara Heyns; that several of the reviewers had professional, and a few had personal, relationships with Dean Wiley; and that there were among the reviewers individuals who did not completely share plaintiff's professional views about private education. Plaintiff recommended Hank Levin, Charles Bidwell, and William Schmidt to her *ad hoc* committee as appropriate peer reviewers. Dean Wiley suggested that plaintiff list James Coleman as a peer reviewer, and Dr. Coleman gave plaintiff favorable reviews and testified for her at trial.

James March is an eminent organizational theorist who has expertise in plaintiff's area of research in school organizations. Dr. March is not a social friend of Dean Wiley but rather a professional acquaintance. Henry Levin was one of the leading scholars in the country who focused on econometric production function models for analyzing the effectiveness of schooling, another of plaintiff's areas of research. Dr. Levin was also the co-editor of a book that had accepted one of plaintiff's chapters for inclusion. Dean Wiley did not summarize his telephone conversation with Dr. Levin for plaintiff's 1986 *ad hoc* committee because Dr. Levin sent a separate letter. Charles Bidwell was an appropriate person to review plaintiff's scholarship as he was Chairman of the Department of Education at the University of Chicago. Although plaintiff called two of her peer reviewers as witnesses at trial, neither testified that Dean Wiley attempted to influence their evaluations of plaintiff's scholarship.

67. The 1986 *ad hoc* committee met on April 24, 1986, and requested that plaintiff revise her curriculum vita.

68. In checking plaintiff's curriculum vita against her submitted works, Karen Fuson found that plaintiff's vita was overstated and did not accurately represent the status of her work. The committee requested plaintiff to revise her vita and clarify the status of all of her papers. The revised vita that the *ad hoc* committee sent to the peer reviewers accurately reflected the status of plaintiff's work.

69. Michael Piechowski's *ad hoc* committee did not conduct such "detective work" because his vita accurately reflected the status of his works.

70. Dean Wiley sent a letter to plaintiff's peer reviewers that stated, "As none of these book manuscripts is finished enough to send to you, I am instead enclosing the papers that represent recent scholarship and suggest the kind of work which Barbara intends to include in the books she is now preparing." There was no evidence that any other tenure candidate, whether male or female, had a letter sent to peer reviewers with a similar statement. However, the letter sent to plaintiff's peer reviewers accurately reflected

the status of plaintiff's work in that plaintiff had not completed any book manuscripts.

71. In Dan Lewis's and Bruce Spencer's cases, the letters to the peer reviewers asked them to review the candidates' scholarly and professional contributions and their future potential as scholars. In plaintiff's case, peer reviewers were asked to evaluate whether her papers and publications manifested "sufficient strength and depth of scholarship to qualify her for tenure at a School of Education whose primary goals are research and doctoral training" and were asked to comment on whether the reviewer "would support [plaintiff] for tenure at [the reviewer's] own institution."

72. In 1985, there were only nine peer reviewers who responded for Bruce Spencer compared with sixteen for plaintiff. In 1986, there were nineteen peer reviewers who responded for plaintiff's tenure review, exceeding the number of peer reviewers who had responded during Dan Lewis's, Bruce Spencer's, Fay Cook's, or Michael Piechowski's tenure reviews.

73. In determining which of plaintiff's papers to send to her peer reviewers, plaintiff's 1986 ad hoc committee selected recent articles in which plaintiff was either the sole or first author from each of the research areas set forth in plaintiff's Statement of Purpose (except for her research on Asian–American students for which no article was available). The ad hoc committee selected: (1) "The Salt of the Earth" because plaintiff was the first author, plaintiff had presented the paper publicly at a recent AERA meeting, and it reflected plaintiff's work with respect to mid-career teachers; (2) "Tracing the Provenance of Teacher Education" because plaintiff was the sole author, it was to be published as a chapter in an edited book, and it reflected plaintiff's work on the Quality of the Doctorate data collection; (3) "Further Evidence of School Effects" because plaintiff was the sole author, the article had been published in a refereed journal, the article reflected plaintiff's dissertation research, and the article was substantive and technical; (4) "Trends in Private Schools: School and Class Size Implications" because plaintiff was the first author, the article was recent, the article was derived from the Newcomers Study, and the article demonstrated plaintiff's empirical and analytical abilities; (5) "Private Schooling: An Equity Perspective" because plaintiff was the sole author, the article was recent, and the article was derived from the Newcomers Study; and (6) "Parents and School Life: Varieties of Parent Participation in Differing Types of Private Schools" because plaintiff was the first author, the article was recent, the article was derived from the Newcomers Study, the article demonstrated plaintiff's empirical ability, and plaintiff indicated that the article's findings were cited as making an important contribution in the literature.

74. Plaintiff's ad hoc committee had many reasons for not sending plaintiff's peer reviewers the Newcomers Study or chapters from it. The Study was an unpublished final report to a granting agency rather than a book manuscript and it had not undergone any peer review process. Even plaintiff suggested not sending the entire Study to her peer reviewers because of its length (1000 pages), especially given the brief amount of time that the reviewers had to return their evaluations. The ad hoc committee did not send plaintiff's peer reviewers chapters of the final report principally written by plaintiff because it would be difficult for them to assess those chapters without the remainder of the report and the senior author of the Study, Diana Slaughter, conceptualized the Study and extensively collaborated with plaintiff on all of the chapters. Moreover, the committee sent to her peer reviewers plaintiff's more recent complete articles derived from the Newcomers Study where plaintiff was the first author.

75. The dean's office informed plaintiff's peer reviewers that Northwestern would send them any additional item listed on plaintiff's vita upon their request. Plaintiff did not request that the ad hoc committee not send any of the articles that were sent to her peer reviewers. Where plaintiff asked the committee not to send a particular article to her peer reviewers, the committee complied with plaintiff's request.

76. Because of the importance of tenure, at Northwestern a tenure candidate's peer review letters must be nearly unanimous in

support of the candidate's scholarship to support a positive tenure decision. Plaintiff's 1986 *ad hoc* committee received an alarming number of peer review letters that consistently raised very specific and substantial criticisms of her scholarship. The *ad hoc* committee did not misrepresent any peer review letter and it quoted from both positive and negative peer review letters in its report. The committee also did not quote in the report the most severe criticism of her work from a peer reviewer. Plaintiff's *ad hoc* committee contacted Thomas Popkewitz for a substantive review of plaintiff's work and he wrote a favorable letter. Diana Slaughter and Elizabeth Sulzby were not contacted to be peer reviewers. They, however, provided input into plaintiff's tenure review as senior faculty members in the School.

77. The *ad hoc* committee exercised its academic judgment and reviewed all of plaintiff's submitted articles during its deliberations. The committee cited three articles in the report to illustrate recurring problems in plaintiff's scholarship. In "Educational Choice of Blacks in Urban Private Schools," which plaintiff had submitted for publication as a chapter in an edited book, plaintiff made elementary errors in data interpretation and erroneous conclusions by comparing proportions of families selecting private education in a $10,000 income increment with proportions of other families selecting private education in $5,000 income increments. Plaintiff also did not set forth evidence supportive of her conclusions regarding parental school choices. The *ad hoc* committee reviewed the latest version of the "Educational Choice" article that plaintiff provided the committee.

In "Private Schooling: An Equity Perspective," which plaintiff had sole-authored and was derived from the Newcomers Study, plaintiff misinterpreted data from a chart when she calculated the proportions of minorities and non-minorities below the poverty level who selected private schools for their children. This error led plaintiff to conclusions opposite of those actually supported by her data.

In "Salt of the Earth," which plaintiff had presented publicly at a recent AERA meeting, plaintiff failed to explicitly set forth the limitations of her sample, which was a very limited and homogeneous sample, which would have guided the reader as to the validity of the generalizations she was making.

The committee found that:

Throughout our review of her writings, we were deeply troubled by the persistent incongruities between her arguments and the data she used to support those arguments. Her papers do not display the kind of sustained scholarly argument supported by data that is needed to advance the frontiers of research in a field.

78. The FPRC made no recommendation concerning plaintiff's 1986 tenure review.

79. A near unanimous recommendation of the Senior School Faculty is necessary to consider the vote a positive one for purposes of recommending tenure. In June 1986 the Senior School Faculty was almost evenly split on whether to recommend tenure for plaintiff, voting six to five against tenure and promotion. The Senior School Faculty also passed two resolutions; one commenting that plaintiff's *ad hoc* committee report exhibited a lack of balance and the second stating that plaintiff was promising and would receive tenure in another institution.

80. After carefully considering plaintiff's scholarly work, her *ad hoc* committee's unanimous recommendation that plaintiff not be granted tenure, her peer review letters, the FPRC and Senior School Faculty deliberations, and the Senior School Faculty's negative recommendation, Dean Wiley concluded that plaintiff's scholarship exhibited a lack of craftsmanship and was not sufficiently strong to merit an award of tenure at Northwestern. Dean Wiley decided not to grant plaintiff tenure and promotion, and informed plaintiff by a letter dated June 30, 1986, that "the University has decided not to grant you promotion and tenure." The provost did not review plaintiff's scholarly materials or the tenure process; the reason the provost did not substantively review plaintiff's tenure qualifications was that plaintiff did not appeal the decision to the provost on substantive grounds. Sex discrimination could have influenced plaintiff's tenure review without the provost's knowledge.

81. Plaintiff appealed Dean Wiley's decision to deny her tenure to UFRPTDAP in August 1986. In her UFRPTDAP appeal, plaintiff made an allegation of sex discrimination. The UFRPTDAP Panel, chaired by female faculty member Carol Simpson Stern, who was very active in the AAUP and a strong advocate for the faculty, thoroughly investigated the allegations contained in plaintiff's appeal, including her allegations of sex discrimination, and found that they lacked merit. The UFRPTDAP Panel recommended to the provost that plaintiff's appeal be denied.

82. Plaintiff filed her Equal Employment Opportunity Commission (EEOC) charge alleging sex discrimination on April 6, 1987. Dr. David Cohen, acting in lieu of then-Provost Robert Duncan, reviewed UFRPTDAP's report and, being satisfied with its thoroughness and completeness, notified plaintiff by letter dated April 17, 1987, that he was denying her appeal of her tenure denial. The provost does not normally conduct independent investigations of UFRPTDAP appeals in that such investigations are the primary province of the UFRPTDAP panel.

83. The evidence does not support the conclusion that when Dean Wiley influenced the review processes of female faculty the results were negative and that when he influenced the reviews of male faculty the results were positive. Upon Dean Wiley's positive recommendation, Northwestern granted tenure to Elizabeth Sulzby despite the negative recommendation of her *ad hoc* committee. Upon Dean Wiley's favorable recommendation, Northwestern granted tenure to female faculty members Karen Fuson, Diana Slaughter, and Fay Cook. Dean Wiley denied tenure to male faculty member Michael Piechowski, even though both the FPRC and Senior School Faculty recommended that he be granted tenure.

84. Bruce Spencer, Fay Cook, and plaintiff were reviewed for tenure during the 1984–85 academic year. Both Bruce Spencer's and Fay Cook's *ad hoc* committee reports were very positive and the FPRC sent Bruce Spencer's *ad hoc* committee report back for rewriting because it was judged to be unduly positively biased. Dr. Spencer suggested to Dean Wiley that his *ad hoc* committee send certain articles to his peer reviewers and Dean Wiley communicated his request to the *ad hoc* committee. Northwestern awarded tenure to Bruce Spencer and Fay Cook effective September 1, 1985.

85. Northwestern reviewed Dan Lewis and plaintiff for tenure during the 1985–86 academic year and awarded tenure to him effective September 1, 1986. Dean Wiley chose Bernice Neugarten, a female faculty member whom he had hired with tenure and had requested in 1983 to advise and counsel Dan Lewis on his tenure review, to chair Dan Lewis's tenure *ad hoc* committee which made a positive recommendation. Dean Wiley also selected Bernice Neugarten to chair the *ad hoc* committees that recommended denying tenure to Michael Piechowski and granting tenure to Fay Cook.

86. Dean Wiley recommended that Dan Lewis be granted tenure because, unlike plaintiff, he had written two books and edited another, he had published articles in four first-tier refereed journals, he had peer review letters that were unanimously positive, his FPRC and Senior School Faculty recommendations for tenure were overwhelmingly positive, and the quality of his scholarly work merited tenure. Unlike plaintiff, Dr. Lewis principally relied upon qualitative, as opposed to quantitative, methods in his research, so Dean Wiley's observation that Dr. Lewis's multiple regression analysis could be stronger did not detract from the central theme and overall quality of Dr. Lewis's scholarship. In contrast, at the time of her 1986 tenure review, plaintiff had not written any books nor had she had articles accepted or published in any first-tier refereed journals.

87. Dean Wiley recruited Bruce Spencer, co-taught a course with him, co-authored an article with him, supported him for a visiting professorship at Stanford University, and acted as his mentor. The visiting professorship gave Bruce Spencer additional time for his scholarship and enabled him to establish contacts with Stanford scholars who could later serve as peer reviewers for his tenure review. Andrew Gordon co-authored an arti-

cle and presented a paper at a conference with Dan Lewis. Bernice Neugarten and Claude Mathis were requested by Dean Wiley at the time of Dan Lewis's being placed on tenure track in 1983 to advise and counsel him on his tenure review.

88. Dean Wiley was plaintiff's mentor. Dean Wiley helped promote plaintiff's career and her publications, wrote letters of recommendation for her when she sought positions outside of Northwestern, recommended her for grants, worked with her on a proposal for funding research, invited her to affiliate with the ML Group for Policy Studies for Education (a research organization), helped her prepare for her reappointment review, requested that her 1983 reappointment *ad hoc* committee advise her "how she might most profitably direct her scholarly efforts toward the tenure review scheduled to begin early in 1985," and helped plaintiff prepare for her 1985 tenure review. Dean Wiley did not co-author an article with plaintiff and did not help her obtain a visiting professorship. Plaintiff's work with the Dean's Network enabled her to have contact with scholars outside of Northwestern and the research associate position that plaintiff ultimately declined would have given her additional time for her research.

89. The evidence does not establish that gender-based disparities existed in the School with respect to faculty course loads or salaries. The evidence establishes a wide range of behavior by male senior faculty during plaintiff's employment at Northwestern that plaintiff maintains demonstrates that female faculty were subjected to a "sexually-charged atmosphere." Solomon Cytrynbaum's two statements to plaintiff, "Ah, the Dean's girl Friday," were innocuous. Claude Mathis's habitual statements to plaintiff and to a female graduate student, "You should just go home and have babies," were gender stereotypical statements, but hardly contributed to a "sexually-charged atmosphere." Don Collins's meetings with plaintiff in 1979 (before David Wiley became dean) at 5:30 in the afternoon in his darkened office during which he patted plaintiff's hand seem more strange than anything else. The

most serious of the behavior occurred in social settings rather than academic ones. John Wick frequently made sexually suggestive remarks to faculty members and graduate students and touched female graduate students on numerous occasions at Friday afternoon parties. Richard Lesh made unwanted advances toward Elizabeth Sulzby in 1979 which consisted of his putting his hand on her knee and having it removed several times while she was driving him home from a Christmas party which the faculty attended. George Beauchamp made cruder unwanted advances toward Elizabeth Sulzby at the end of his retirement party in the early 1980s by grabbing and french kissing Elizabeth Sulzby. For purposes of plaintiff's case, the most serious incidents involved James Hall who, while at Elizabeth Sulzby's home at a party for her fiance, grabbed and French kissed Elizabeth Sulzby in the kitchen, and who on one occasion at a party grabbed plaintiff's breast. There was testimony about James Hall's having grabbed plaintiff's breast on another occasion, but there was credible testimony from James Hall's wife, Karen Fuson, that they had been away from Northwestern on sabbatical at the time of that party and so had not attended it, so the court finds that the evidence does not establish the second breast-grabbing incident. The only evidence with respect to Dean Wiley is that he stared at plaintiff in 1979 and 1980. There is no evidence that Dean Wiley ever engaged in any unwelcome touching, sexual remarks or innuendo. Of the male faculty members who engaged in the foregoing conduct, with the exception of Dean Wiley, none was on plaintiff's 1986 *ad hoc* committee, Solomon Cytrynbaum and Claude Mathis were members of the FPRC in 1985–86, and Solomon Cytrynbaum, Claude Mathis, and John W. Wick were eligible to vote as members of the Senior School Faculty in 1985–86. There is no evidence that any of the above conduct had any impact on the decision to deny tenure to plaintiff in 1986.

90. Four years after plaintiff's tenure denial, Dean Wiley appointed Dan Lewis, a full-time faculty member, to an associate dean position in 1990 with a salary increase to entice him to accept the position because the administrative responsibilities were not a

part of his regular faculty appointment. Plaintiff's situation was significantly different from Dan Lewis's because she was hired to perform administrative duties from the start. Male faculty members who were assigned administrative duties were tenured at the time of being assigned those duties.

91. Dean Wiley instituted a nominal faculty course load of six courses per year. That nominal course load was often not the actual course load faculty had to teach. Bruce Spencer never once carried a full course load, was given course credit for designing a course without teaching it, and was allowed to "buy off" courses with grant monies received. Plaintiff was never afforded the opportunity to buy off courses with grants, but also never taught a full faculty course load during her career at Northwestern. Other female faculty members in the School also received reduced course loads.

92. Other male faculty granted reduced course loads included Barton Hirsch and Dan Lewis.

93. Dean Wiley alone had the discretion to reduce faculty course loads and to set faculty salaries.

94. Bruce Spencer and Dan Lewis earned more as untenured assistant professors during the 1984–85 academic year than Elizabeth Sulzby and Diana Slaughter each earned that year as associate professors with tenure. Both Spencer and Lewis also earned more than plaintiff that year despite the fact that plaintiff held the assistant professor title one year longer than either of them. This wage disparity between Lewis and Spencer on the one hand, and plaintiff on the other, continued the following year. Fay Cook earned more than either Dan Lewis or Bruce Spencer during 1984–85 and 1985–86.

95. The evidence does not support plaintiff's claim that all female faculty who were tenure-eligible under Dean Wiley encountered artificial barriers to their tenure. Northwestern granted tenure to Elizabeth Sulzby despite her negative *ad hoc* committee report on Dean Wiley's recommendation. Dean Wiley denied tenure to male faculty member Michael Piechowski even though both the FPRC and the Senior School Faculty recommended that he be granted tenure. Dean Wiley recommended Diana Slaughter for tenure in April 1980 and it was conferred by the Board of Trustees effective September 1, 1980, though due to a slip up in the provost's office she did not receive official notification of this until several years later when she requested notification. Elizabeth Sulzby left Northwestern in 1986 to accept a better offer from the University of Michigan. Dean Wiley offered her double the percentage salary increase of any other faculty member in the School in an attempt to persuade her to remain at Northwestern, but was unable to match the offer she had received.

96. Karen Fuson was initially denied tenure. She had only been at Northwestern two years at the time of her initial tenure review prior to Dean Wiley's deanship. While untenured, she married James Hall. Subsequently, she was granted tenure. The evidence does not establish that her marriage to James Hall was the cause of the grant of tenure. Rather, the evidence establishes that she was initially reviewed for tenure at a very early stage in her career at Northwestern, and that by the time of her second tenure review she had sufficiently established herself to the satisfaction of Northwestern as an excellent scholar to warrant the grant of tenure at that time.

97. Susan Swing, an assistant professor hired in 1985, never reached a tenure review. She was denied reappointment despite a series of publications in first-tier refereed journals. Dean Wiley decided not to renew Susan Swing's appointment, upon the recommendation of her reappointment *ad hoc* committee, because she had written very little during her three years at Northwestern, her service was not outstanding, and students complained about her teaching. No males were ever denied reappointment in the 13 years of David Wiley's deanship.

98. Tom Cook, a tenured faculty member at Northwestern, was a professional acquaintance of Dean Wiley's for many years. Tom Cook had made the first inquiry of David Wiley to determine whether he would be interested in discussing the possibility of becoming Dean of the School of Education.

Fay Cook, who was married to Tom Cook, was an assistant professor at Loyola University when David Wiley became dean. Dean Wiley hired Fay Cook shortly after he became dean. The evidence is that Tom Cook's marriage to Fay Cook had nothing to do with Dean Wiley's decision to recommend that she be granted tenure. Dean Wiley recommended that Fay Cook be granted tenure because, unlike plaintiff, she had published one book and was completing another; she had published articles in three first-tier refereed journals; her peer review letters were overwhelmingly positive; her *ad hoc* committee, the FPRC, and the Senior School Faculty unanimously recommended that she be awarded tenure; and she was a thorough and very competent scholar.

99. Michael Piechowski was the only male candidate denied tenure under Dean Wiley. His circumstances were different from those of all other assistant professors who were tenure-eligible during David Wiley's deanship in that he was older, being in his 50s; he had an employment history of a series of faculty appointments prior to coming to Northwestern, some in microbiology and chemistry and at least one in Educational Psychology, none of which resulted in tenure; the nature of his work was esoteric; and he did not meet the needs of his program area, Counseling Psychology. Michael Piechowski's tenure review was conducted under the 1981 procedures. Michael Piechowski's scholarship record was judged stronger than plaintiff's in that he had published three books at the time of his tenure review and had more publications in refereed journals. The evidence adduced tends to establish that Michael Piechowski's age; prior career in biology and chemistry; and fit (or lack thereof) with his program area's needs did not affect Northwestern's decision to deny tenure to him.

100. The explanations of defendant's witnesses as to why they did not send all or part of the Newcomers Study report to the peer reviewers were highly credible. That multiple explanations were given merely indicates that there were several legitimate reasons for not sending all or part of that report. As an unpublished report to a granting agency rather than a book or article, it had not undergone the peer review process. The bulkiness of the document would have made it difficult if not impossible for peer reviewers to read and absorb it, especially in the telescoped time they had in which to make their recommendations due to the shortening of plaintiff's 1986 tenure review, a shortening requested by plaintiff to allow her more time in which to prepare. The concern that sending the whole report might also have made it less likely that peer reviewers would review plaintiff at all, when the *ad hoc* committee wanted as high a response rate from peer reviewers as possible, was certainly legitimate as well. The concerns about sending individual chapters stemmed from their being part of a longer work and from the work being collaborative. As part of a longer work, there was difficulty with the representativeness of particular chapters; that is, with the peer reviewers getting a part of the Newcomers Study report that would allow them to judge the work as a whole. As a collaborative work initially conceptualized by Diana Slaughter, there were difficulties in determining what part of it represented plaintiff's work and what part Diana Slaughter's. In addition, being a collaborative work limited the chapters from which to choose for sending to peer reviewers, as only those for which plaintiff was primarily responsible would have been appropriate to send to peer reviewers being requested to express opinions on whether her scholarly work merited her being tenured at Northwestern. These reasons for not sending all or part of the Newcomers Study report to peer reviewers are highly credible, and the court finds that these were in fact the reasons that the Newcomers Study report was not sent to plaintiff's peer reviewers in 1986.

101. Northwestern did send collaborative works to Dan Lewis's peer reviewers and plaintiff's *ad hoc* committee sent collaborative works to plaintiff's peer reviewers. However, those works were first-authored by the tenure candidate, or were chapters in a book, and did not suffer from the bulkiness problem of the whole Newcomers Study report, the representativeness problem of individual chapters of the Newcomers Study report, or the difficulty of determining the

candidate's contribution to the work. The distinction made by Northwestern was reasonable, as first authorship of an article does suggest that the article is primarily representative of the candidate's work, and authorship of a chapter in a book is likewise suggestive that the work is the candidate's. The conclusion that defendant's witnesses expressed the real reasons all or part of the Newcomers Study report was not sent to peer reviewers is not altered by the statement of plaintiff's 1983 reappointment *ad hoc* committee that:

> The Newcomers Study seems to be the obvious best bet. Nevertheless, the question remains, can it be completed and recognized as a substantial contribution by the time of her tenure review.

In 1983, the *ad hoc* committee could not have known of the problems that would make the report of the Newcomers Study inappropriate to send to peer reviewers. Moreover, although the report of the study might not have been appropriate to send, a published book based on the study might have been appropriate to send. Also research from the Newcomers Study reported in articles sole- or first-authored by plaintiff would have been appropriate to send, as evidenced by the articles based on the Newcomers Study that were in fact sent to plaintiff's peer reviewers. The 1983 *ad hoc* committee might have anticipated plaintiff's best chance of having works of the appropriate sorts, preferably books or articles in first-tier refereed journals, to present for her tenure review was in concentrating on the Newcomers Study, but even so expressed the concern that she might not be able to have the Newcomers Study completed and recognized as a substantial contribution in time for her tenure review.

102. There is no question that, in the Newcomers Study report, the authors meticulously indicated which of them had been responsible for which parts of the report. This does not alter the court's conclusion that concerns connected with the collaborative nature of the work, stated by Northwestern's witnesses as among the reasons for not sending all or part of the Newcomers Study report to peer reviewers, were among the real reasons all or part of the Newcomers Study report was not sent to the peer reviewers.

103. That the 1985 *ad hoc* committee stated that it wished the final Newcomers Study report was available because it was a potential source of a major contribution is of little significance. That committee did not have the final report before it and so cannot be expected to have anticipated the various problems sending that report to peer reviewers, especially peer reviewers with an unusually short time in which to respond, would pose.

104. Although they did not read every word of it, Dean Wiley and the members of the 1986 *ad hoc* committee considered the Newcomers Study report as part of plaintiff's 1986 tenure review.

105. Northwestern required an established and demonstrated excellence in scholarship for tenure. Different members of the 1986 *ad hoc* committee operationalized this in different ways; they phrased the test differently and at least one felt that publication of at least one book was necessary. They were agreed that several articles in first-tier refereed journals was necessary as an indication of quality scholarship because of the blind (without knowledge of the identity of the author) review of the articles by top scholars in the field involved in the refereeing process by which articles are accepted for publication at those journals. All successful male and female tenure candidates in Northwestern's School of Education under Dean Wiley had published articles in first-tier refereed journals prior to their tenure reviews. Plaintiff's 1983 reappointment *ad hoc* committee had emphasized to her the necessity of publication in top-tier refereed journals and listed journals in which plaintiff should seek to publish. Plaintiff failed to publish or have any article accepted in a first-tier refereed journal at the time of her 1986 tenure review. The testimony that plaintiff needed to publish a book or several articles in first-tier refereed journals as a prerequisite to tenure was not incredible. Quite to the contrary, testimony that there was no such requirement for tenure in a School of Education as deeply committed to excellence in scholarship

as Northwestern's would have been incredible.

106. At the time of her 1986 tenure review, plaintiff had a monograph published and several book contracts based on final reports to granting agencies for which no book manuscript yet existed. Plaintiff's *ad hoc* committee and Dean Wiley considered all of plaintiff's submitted materials, including her monograph *America's Small Schools,* which was published by ERIC, in evaluating her tenure qualifications. Karen Fuson's monograph was published in a first-tier refereed journal not because ERIC was the printer, but because the monograph had gone through the extensive peer-review process of the Georgia Center for the Study of Learning and Teaching Mathematics before acceptance. In contrast, plaintiff's *America's Small Schools* was not peer reviewed. Dean Wiley and the 1986 *ad hoc* committee honestly appraised plaintiff's scholarly works; nothing in that appraisal suggests any discriminatory motive.

107. Because defendant is not liable for sex discrimination or retaliation in this action, there is no need to determine what relief to grant plaintiff.

## DISCUSSION

Plaintiff makes two Title VII claims in this action; that defendant committed disparate treatment sex discrimination in denying her tenure and promotion in 1986 and retaliated against her for expression protected by Title VII when defendant refused to reverse the denial of tenure and promotion after plaintiff had claimed sex discrimination in her tenure review. Plaintiff does not make a claim for sex discrimination in connection with her 1985 tenure review; does not make a claim for sexual harassment; and does not make a claim of disparate impact. Nor does plaintiff make a claim for breach of her employment contract. All evidence in this case was admitted only to the extent that it bears on plaintiff's claims of disparate treatment sex discrimination in the denial of tenure and promotion in 1986 and retaliation in the refusal to reverse that denial on appeal.

### A. *Sex Discrimination*

Title VII makes it:

[A]n unlawful employment practice for an employer— ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... sex[.]

42 U.S.C. § 2000e–2(a)(1). Plaintiff's disparate treatment sex discrimination claim is that defendant denied her tenure and promotion to associate professor because of her sex. 42 U.S.C. § 2000e–2.

Plaintiff may establish her claim either by direct proof or by use of the burden-shifting approach established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 477 (7th Cir.1995). Under the burden-shifting approach, plaintiff is first required to establish a prima facie case showing that (1) she was a member of a protected class, (2) she was qualified for tenure, and (3) an applicant not in the protected class was granted tenure. *Namenwirth v. Board of Regents of University of Wisconsin System,* 769 F.2d 1235, 1240 (7th Cir.1985). The establishment of a prima facie case raises a presumption of discrimination. *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 919 (7th Cir.1996). After a plaintiff establishes a prima facie case, the burden of production shifts to the defendant employer to come forward with a legitimate, nondiscriminatory reason for its actions. *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 919 (7th Cir.1996); *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 479 (7th Cir.1995). If the employer comes forward with such a reason, the burden shifts back to plaintiff to show by a preponderance of the evidence that the proffered reasons are pretextual for discrimination. *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 919 (7th Cir. 1996). The burden shifted to defendant in this approach is only the burden of production; the burden of persuasion remains with plaintiff at all times. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■ There is no direct evidence that defendant discriminated against plaintiff because of her sex when it denied her tenure and promotion to associate professor. Therefore, plaintiff has used the burden-shifting approach in her attempt to prove her sex discrimination claim. Under that approach, there is no question that plaintiff has established a prima facie case; she was a member of a protected class (female); was qualified for tenure (defendant, after all, twice reviewed her for tenure), see *Namenwirth v. Board of Regents of University of Wisconsin System,* 769 F.2d 1235, 1240 (7th Cir.1985) ("Mere qualification depends on objective measures—the terminal degree, the number of publications, and so on. Tenure requires something more; it requires that the department believe that the candidate have a certain amount of promise."); and an individual not in the protected class received tenure (certainly Dan Lewis, and probably Bruce Spencer even though he was tenured in the year previous to plaintiff's 1986 tenure review). There is also no question that the reason defendant has come forward with, that her scholarship was not of sufficient quality to merit tenure at Northwestern, was a legitimate and non-discriminatory reason for denying tenure and promotion. The question in vigorous dispute in this action is whether that reason was a pretext for sex discrimination.

■ Defendant takes the position that a plaintiff "must meet a higher standard in an employment discrimination case involving tenure because of Court deference to academic judgment." Although this may once have been true:

Recent court opinions in academic discrimination cases make it clear that postsecondary institutions have no special dispensation from the requirements of federal antidiscrimination legislation. Courts will defer to institutions' expert judgments concerning scholarship, teaching, and other educational qualifications if they believe that those judgments are fairly reached, but courts will not subject institutions to a more deferential standard of review or a lesser obligation to repair the adverse effects of discrimination.

William A. Kaplin and Barbara A. Lee, *The Law of Higher Education* § 3.3.2.1 at 214–15 (Jossey–Bass, 3d ed 1995). Moreover, the concerns that have led courts in the past to defer to postsecondary institutions' judgments overstate the problem, at least in the context of determining whether an institution's proffered reasons for an allegedly discriminatory employment action are pretextual under the current state of the law.

■ That the decision to tenure a faculty member is of the greatest concern to an academic institution is plain. For a postsecondary institution, a grant of tenure represents a virtual lifetime commitment of employment to the individual upon whom it is conferred. It also lessens the institution's freedom to improve its academic standing in the tenured individual's field by filling the position that person holds with a more highly-regarded scholar. Moreover, the courts do in fact lack the expertise necessary to make the scholarly judgments necessary to determine whether an individual merits tenure at a particular institution. But these concerns do not require the sort of deference defendant seeks in an employment discrimination case.

Deference is not necessary or appropriate where the manner of proof is direct evidence of discrimination. It is unnecessary to delve into any peculiarly academic judgments when there is direct proof that discrimination caused an employer to take an adverse action.

Where the burden-shifting approach is the method used to prove discrimination, deference is also unnecessary. When the burden-shifting approach is used, assuming plaintiff is able to establish a prima facie case of discriminatory denial of tenure, the institution will often proffer as reasons for the denial of tenure plaintiff's failure to meet the institution's standards for tenure with respect to some combination of scholarship, teaching, and service. If it were necessary for a court to determine whether a plaintiff's scholarship, teaching, and/or service warranted a grant of tenure at the institution, the argument that the court lacks expertise to make such judgments would be of great force. But such a determination is unneces-

sary, and largely irrelevant, to the determination of whether the reason proffered by the institution is pretextual.

When an institution proffers as its reason for denying tenure insufficient scholarship, poor teaching, or lack of service, whether the candidate's scholarship was in fact insufficient; teaching was in fact poor; or service was in fact lacking is none of the court's concern. The court's concern is whether the institution, when it made its decision to deny tenure, believed the reasons given. Another way of putting this is that pretext does not mean a mistake on the part of an employer; it means a lie, a phony reason for some action. *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 919 (7th Cir.1996); *Perdomo v. Browner,* 67 F.3d 140, 144 (7th Cir.1995); *Russell v. Acme–Evans Company,* 51 F.3d 64, 68 (7th Cir.1995); *Kralman v. Illinois Department of Veterans' Affairs,* 23 F.3d 150, 156–57 (7th Cir.1994). Thus, when an institution proffers as reasons for denial of tenure deficiencies in a plaintiff's scholarship, teaching, or service, the court is not concerned with whether plaintiff's scholarship, teaching, or service were in fact deficient; only with whether the defendant institution honestly believed they were deficient when it decided to deny tenure. The appropriate inquiry being concerned with what the defendant believed, and not with the correctness of that belief, a court in a Title VII discrimination case is not drawn into making the kind of academic judgments for which it lacks expertise.

Dean Wiley was the decisionmaker; it was through him that defendant denied plaintiff tenure and promotion to associate professor. However, Northwestern's tenure review process is such that sex discrimination at other levels of the review might cause an adverse decision at the level of Dean Wiley. The actors at the other levels of the review that could have had this effect were the *ad hoc* committee; the FPRC; and the Senior School Faculty. The actions of UFRPTDAP and the provost are not included in this list; they came during the appeal, after the decision about which plaintiff complains in her sex discrimination claim, and plaintiff has not made any sex discrimination (as opposed to

retaliation) claims against them. It would be something of a stretch to attribute the actions of the peer reviewers to Northwestern. Most were scholars unaffiliated with Northwestern. There being no evidence of sex-based animus in their reviews of plaintiff, it is unnecessary to consider them in any event.

Plaintiff has made a number of claims about biases the members of the *ad hoc* committee may have had against her and about the conduct of the tenure review by the *ad hoc* committee. Oswald Werner is supposed to have had a bias against plaintiff due to disagreements resulting from their co-chairing a doctoral candidate's dissertation committee and, apparently, due to his having been a peer reviewer of plaintiff in the 1985 tenure review. Andrew Gordon is supposed to have had a bias against plaintiff because he had a bias in favor of Dan Lewis, also a candidate for tenure in 1986. His bias in favor of Dan Lewis was because he had "mentored" him, and because Dan Lewis's tenure would supposedly benefit the Center for Urban Affairs (at which Andrew Gordon held an appointment and of which his wife, Margaret Gordon, was director). Plaintiff, however, did not manage to prove that a grant of tenure to plaintiff would have lessened Dan Lewis's chances at tenure. Also, Margaret Gordon's chairing the UFRPTDAP panel that decided plaintiff's appeal of her 1985 tenure denial in plaintiff's favor was supposed somehow to have biased him against plaintiff. The only black mark against Robert Church was that he knew plaintiff from the School of Education. However, it was not the case that to know plaintiff was to be biased against her; the evidence was that Robert Church was a friend of plaintiff who, if anything, began the tenure review biased in plaintiff's favor. Karen Fuson's husband, James Hall, had once made sexual gestures toward plaintiff.

Most noteworthy in all of this is that only one of the alleged biases, that of Karen Fuson, arguably had anything at all to do with plaintiff's gender. The incident underlying Karen Fuson's alleged bias, in which James Hall made sexual gestures toward plaintiff (i.e., grabbed her breast), was not witnessed by Karen Fuson, and plaintiff presented no

evidence that Karen Fuson was otherwise aware of the incident at the time of her service on the *ad hoc* committee (or at the time of the Senior School Faculty vote for that matter). Moreover, the court does not believe that any of the other members of the *ad hoc* committee harbored any bias against plaintiff at the time of the *ad hoc* committee's review of plaintiff for tenure. Accordingly, there was no sex discrimination in the *ad hoc* committee's review of plaintiff for tenure in 1986.

The next level of review was the FPRC, which reviewed the *ad hoc* committee's report for completeness and then, after considering the report and additional evidence submitted by the candidate, made a recommendation. Plaintiff's proposed findings of fact and conclusions of law do not address themselves to discrimination by the FPRC, and the evidence did not establish sex discrimination by that body.

The level of the Senior School Faculty is somewhat more problematic. This is a significant body because, although it was not always dispositive of Dean Wiley's decision on whether to deny or to recommend tenure, one of the things that Dean Wiley looked for was near unanimous support for tenure among the Senior School Faculty, who voted six to five against recommending tenure for plaintiff. Among the faculty eligible to vote were Solomon Cytrynbaum, Claude Mathis, and John Wick. The only potentially relevant evidence as to Solomon Cytrynbaum was that he had said, "Ah, the Dean's Girl Friday" to plaintiff twice. As to Claude Mathis, the evidence was that he had said to plaintiff on multiple occasions, what was she doing, she "should just go home and have babies." And John Wick frequently made sexually suggestive remarks to faculty members and graduate students and touched female graduate students at Friday afternoon parties. The evidence did not establish that any of these faculty members took part in the meeting of the Senior School Faculty, or worked against plaintiff's tenure, or even voted against her receiving tenure. In other words, plaintiff has not established that any of the three faculty members eligible to vote who were accused of having acted in either a gender stereotypical or sexually harassing way voted against her receiving tenure due to gender-based animus, or influenced other faculty members to vote against her tenure. Plaintiff moreover did not prove that any of the sexually harassing conduct or stereotypical statements of individuals not eligible to vote with the senior faculty on plaintiff's 1986 tenure review had any effect on the outcome of that vote. Therefore, plaintiff did not establish that the Senior School Faculty's failure to vote nearly unanimously in support of her receiving tenure was the result of sex discrimination.

Plaintiff's sex discrimination claim, then, really comes down to Dean Wiley. The pivotal role of Dean Wiley was recognized throughout the trial of this case.

Oddly enough, it is here that plaintiff's theory that the members of her *ad hoc* committee all had biases against her of various kinds would be potentially of most force. Even though the biases the members are accused of having against her are for the most part not based upon her sex, if Dean Wiley stacked the *ad hoc* committee with faculty members he knew had other kinds of biases against plaintiff because Dean Wiley had a sex-based animus against plaintiff, that might be sufficient to taint the tenure review process. As noted, however, the evidence did not establish that any of the *ad hoc* committee members were biased against plaintiff's receiving tenure. In addition, the evidence did not establish that Dean Wiley knew any of the *ad hoc* committee members to be biased against plaintiff's receiving tenure, and such knowledge would be necessary to his committing sex discrimination in such a byzantine manner. In fact, one member of the *ad hoc* committee Dean Wiley selected, Robert Church, was plaintiff's friend and, if anything, biased in her favor. Dean Wiley's selection of Robert Church to be on the *ad hoc* committee might nonetheless be thought consistent with Dean Wiley's stacking the committee against plaintiff if it were shown that he had an unusually high standard for recommending the grant of tenure. But this was not shown; the standard Robert Church enunciated was consistent with the standards enunciated by others who served on plain-

tiff's 1986 *ad hoc* committee and on other *ad hoc* committees. Thus, if as seems likely Dean Wiley was aware that plaintiff and Robert Church were friends, Dean Wiley's selection of Robert Church to be on plaintiff's *ad hoc* committee is evidence that Dean Wiley was not attempting to stack that committee against a grant of tenure to plaintiff.

Dean Wiley is also accused of having rigged the peer reviewers. Plaintiff established that certain of the peer reviewers knew Dean Wiley, that certain of them were recommended by Dean Wiley, and that certain of them were contacted by telephone by Dean Wiley. At least one of the peer reviewers recommended by Dean Wiley strongly recommended that plaintiff be granted tenure. More significantly, there was no evidence that would tend to establish that Dean Wiley in any way attempted to influence any peer reviewer to make a negative recommendation. Given the high-powered scholars involved, the court is also highly skeptical that Dean Wiley could have influenced any of them to send in negative recommendations even if he had tried.

Plaintiff also contends that Dean Wiley treated her less favorably than her male counterparts, Bruce Spencer and Dan Lewis. The court has previously found against plaintiff with respect to the facts on which this contention is based. The circumstances of plaintiff were different from those of Bruce Spencer and Dan Lewis. Plaintiff contends that Dean Wiley "established barriers in her path that were not encountered by male tenure candidates in the School of Education, including the assignment of administrative duties and increased teaching loads and a premature tenure review." This is not true. In fact, Dean Wiley attempted to help plaintiff put her tenure review off for a year, in which she would not have any teaching or administrative duties and could devote herself to her research, during which she would retain the title of assistant professor and would lose no salary, when he obtained a research associate position for her. That plaintiff chooses to see this as some sort of demotion does not change the nature of the offer; Dean Wiley was offering plaintiff exactly the sort of help she needed at the

time—an extra year to prepare for her tenure review, at full salary, during which plaintiff could devote all of her time to her scholarship. Plaintiff contends that Dean Wiley imposed a higher standard of scholarship upon plaintiff than upon similarly situated male candidates and failed to honestly evaluate her scholarship. This, too, is not true. Plaintiff contends finally that Dean Wiley "intentionally engaged in a calculated effort over time to insure that Plaintiff did not receive tenure." This, too, is untrue. Although Dean Wiley may not have done exactly as plaintiff would have preferred, he in fact tried to help her in her effort to receive tenure, the most dramatic and tangible example of his efforts being the research associate position plaintiff declined.

Plaintiff contends that "[o]ther evidence of sex discrimination in Northwestern's School of Education emerges when the compensation, courseloads, and promotions of male and female faculty are compared." These facts, however, have been found adversely to plaintiff's position.

Plaintiff contends that "[t]he procedural irregularities that plagued each of Plaintiff's tenure reviews and the 1986 review, in particular, are also probative of intent." There were no "procedural irregularities" of any significance established by the evidence in the 1986 tenure review. There were also no procedural irregularities of significance in the 1985 tenure review, with the possible exception of the timing of the tenure review which provided the basis for the provost's decision, on UFRPTDAP's recommendation, to grant plaintiff a second tenure review to give her the benefit of the doubt created by the different interpretations she had been given of when her tenure clock had begun to run.

The court concludes, therefore, that plaintiff has not proven by a preponderance of the evidence that Dean David Wiley decided to deny her tenure and promotion to associate professor because of her sex. There being no sex discrimination established at any of the prior levels of the tenure review that might have tainted Dean Wiley's decision, the evidence does not establish that Northwestern discriminated against plaintiff when

it denied her tenure and promotion to associate professor. Northwestern is accordingly entitled to judgment in its favor on plaintiff's claim of sex discrimination.

## B. *Retaliation*

Plaintiff also makes a claim of Title VII retaliation against defendant. 42 U.S.C. § 2000e–3(a). Plaintiff's retaliation claim is essentially that David Cohen, acting in lieu of Provost Robert Duncan, retaliated against plaintiff for her making the claim, in her· UFRPTDAP appeal and before the EEOC, that she was discriminated against because of her sex in the decision to deny her tenure and promotion. Dean David Wiley made the decision to deny plaintiff tenure and promotion and communicated that decision to her. Plaintiff appealed that decision to UFRPTDAP in August 1986 and to the provost. After UFRPTDAP decided the appeal adversely to plaintiff and before David Cohen notified plaintiff of his decision with respect to the thoroughness and completeness of the UFRPTDAP report, plaintiff filed her charge of sex discrimination with the EEOC on April 6, 1987. David Cohen's letter notifying plaintiff that he was denying her appeal was dated April 17, 1987.

 Title VII makes it:

[A]n unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge under this subchapter.

42 U.S.C. § 2000e–3(a). As with the claim of sex discrimination, plaintiff may establish her retaliation claim either by direct proof or by use of the burden-shifting approach established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 477 (7th Cir.1995). Under the burden-shifting approach, plaintiff is first required to establish a prima facie case showing that (1) she engaged in statutorily-protected expression; (2) she suffered an adverse action by her employer; and (3) the adverse action by her employer was caused by the protected expression. *Johnson v.*

*University of Wisconsin–Eau Claire,* 70 F.3d 469, 479 (7th Cir.1995). To establish the causal link, plaintiff must demonstrate that her employer would not have taken the adverse action but for the protected expression. *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 479 (7th Cir.1995). After a plaintiff establishes a prima facie case, the burden of production shifts to the defendant employer to come forward with a legitimate, nonretaliatory reason for its actions. *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 479 (7th Cir.1995). If the employer comes forward with such a reason, the burden shifts back to plaintiff to prove by a preponderance of the evidence that the proffered reason is a pretext for discrimination. See *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 919 (7th Cir.1996); *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 479 (7th Cir.1995). Again, the shifting only pertains to the burden of production; the burden of persuasion remains with plaintiff at all times. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

 Plaintiff has not, and does not claim to have, presented direct evidence that David Cohen retaliated against her for making her sex discrimination claims in the UFRPTDAP appeal and the EEOC charge. Rather, she has attempted to prove her case by the burden-shifting approach. Plaintiff has established that she engaged in statutorily-protected expression—claiming sex discrimination in defendant's denying her tenure and promotion—and that she suffered an adverse action—the denial of plaintiff's appeal of the decision to deny her tenure and promotion—by her employer. Defendant does not contest this.

Defendant does contest that plaintiff established the causal link element of her prima facie case. According to plaintiff's argument, the decision to deny tenure and promotion was ultimately made by David Cohen when he decided the UFRPTDAP appeal, Dean Wiley's role being to recommend denial of tenure and promotion. The defendant's view is that Dean Wiley denied tenure and promotion, with UFRPTDAP's and David Cohen's roles being to decide an appeal from

that decision. The evidence adduced in this case demonstrated that the dean denied tenure and promotion to plaintiff and the provost's role was to decide an appeal of that decision. See *Lever v. Northwestern University*, 979 F.2d 552, 554–55 (7th Cir.1992) (coming to the same conclusion with respect to the roles of dean and provost in the tenure review process at Northwestern). Defendant's position is that this is the end of the analysis; that the adverse action was the decision to deny plaintiff tenure and promotion, that this occurred prior to plaintiff's first engaging in the statutorily-protected expression in her UFRPTDAP appeal, that therefore the statutorily-protected expression could not have caused the adverse action, and that this means that plaintiff has not established a prima facie case of retaliation.

The problem with defendant's analysis is that the denial of plaintiff's appeal, which was the action taken by David Cohen, was also an adverse action by plaintiff's employer. Although it is true that an employer's refusal to undo a discriminatory decision is not a fresh act of discrimination for purposes of Title VII, see *Lever v. Northwestern University*, 979 F.2d 552, 556 (7th Cir.1992), if the employer refuses to undo the discriminatory decision in order to retaliate against a plaintiff for having engaged in statutorily-protected expression there is no reason that cannot give rise to a claim for retaliation. Therefore, defendant's argument as to why no causal link was established is unpersuasive.

There is a difficulty with the causal link element of plaintiff's prima facie case. Plaintiff's claim is that a causal connection may be inferred because David Cohen's decision of the appeal closely followed plaintiff's claim of sex discrimination. The court does not believe that such an inference is warranted on the facts of this case. What David Cohen had before him was an appeal that had been reviewed and found wanting by UFRPTDAP. This appeal had begun in August of 1986, at which time plaintiff first made her claim that she had been discriminated against because of her sex when she was denied tenure and promotion. There

are at least three reasons the court does not believe the inference for which plaintiff argues is warranted in this case. (1) Plaintiff was notified of the denial of her appeal by David Cohen in a letter dated April 17, 1987, more than seven months after plaintiff initially made her sex discrimination in her UFRPTDAP appeal so, although the EEOC charge was made April 6, 1987, David Cohen's decision did not closely follow plaintiff's first claim of sex discrimination. (2) David Cohen had an appeal before him and his job was to decide it one way or the other. This appeal had been pending in Northwestern's appeal system for more than seven months. It does not seem appropriate to infer that, just because plaintiff filed her EEOC charge shortly before the appeal was decided against her, the appeal was decided that way in retaliation for the EEOC charge. The situation is unlike one in which, shortly after a charge of discrimination is made, an employer discharges or reduces the compensation of an employee or takes some other such adverse action. (3) The evidence does not establish that David Cohen was aware of the EEOC charge at the time he rendered his decision of the appeal. The court therefore will not make the inference plaintiff invites it to make.

The rejected inference being the sole basis on which plaintiff's contention that a causal link between plaintiff's statutorily-protected expression and the adverse action by her employer has been established rests, the court concludes that plaintiff has failed to establish the required causal link. Plaintiff has accordingly failed to establish a prima facie case of retaliation, and defendant is entitled to judgment on that claim.

ORDERED: The court finds in favor of defendant, Northwestern University, and against plaintiff, Barbara Schneider, on her claims of sex discrimination and retaliation under Title VII. Judgment in favor of defendant and against plaintiff will be set forth on a separate document and entered in the civil docket. FRCP 58, 79(a).